997 A.2d 339 (2010)
In re R.M.G., a Minor.
Appeal of York County Children & Youth Services.
In the Interest of R.M.G., a Minor.
Appeal of York County Children and Youth Services.
No. 1664 MDA 2009, No. 1666 MDA 2009
Superior Court of Pennsylvania.
Filed June 4, 2010.
*341 Martin Miller, York, for appellant.
Brooks K. Pomper, York, Guardian Ad Litem, for appellee.
Thomas W. Gregory, Jr., York, for mother, appellee.
BEFORE: GANTMAN, ALLEN, and LAZARUS, JJ.
OPINION BY GANTMAN, J.:
¶ 1 Appellant, York County Children and Youth Services ("CYS"), appeals from the order entered in the York County Court of Common Pleas, denying CYS' petitions to change the placement goal to adoption and involuntarily terminate Mother's parental rights with respect to *342 her minor child, R.M.G.[1] Upon a careful review of the record and the applicable law, we hold the court erred in denying the goal-change and termination petitions. Accordingly, we reverse the order denying CYS' petitions and remand for further proceedings consistent with this decision.
¶ 2 The relevant facts and procedural history of the case are as follows. When Mother's first child, K.R., was five months old, Mother violently shook him until he stopped breathing, which left him in a vegetative state. In 1998, Mother was convicted of aggravated assault, 18 Pa. C.S.A. § 2702(a)(1). Mother received a sentence of four (4) to ten (10) years imprisonment and served five (5) years and ten (10) months of that sentence. Her parental rights to K.R. were terminated.
¶ 3 Mother was released from prison on April 19, 2004 and remained on parole until June 26, 2008. As a condition of her parole, Mother could not have unsupervised contact with children. Despite this requirement, Mother became pregnant and gave birth to J.M.M. on August 2, 2005. J.M.M. entered placement at birth and was declared dependent on August 16, 2005. Mother again became pregnant and gave birth to R.M.G. on October 18, 2006. R.M.G. entered CYS' custody on October 23, 2006 due to Mother's parole conditions and was adjudicated dependent on November 1, 2006. CYS placed R.M.G. in the same foster home as J.M.M., and both children remain in that home. During R.M.G.'s dependency hearing, the court found the existence of aggravating circumstances but nevertheless set the family goal as reunification. The court also ordered Mother to comply with the following conditions:
 Contact CYS to determine what requirements will have to be met before R.M.G. can be returned home.
 Sign any releases necessary and appropriate to allow CYS to monitor compliance.
 Notify CYS of the date for an initial evaluation or counseling session 48 hours prior to the appointment.
 Maintain "safe, stable and appropriate housing for the minor(s) and ... maintain stable, lawful income to support the minor(s)."
 Undergo random drug and alcohol testing if CYS suspects use.
 Cooperate with the intensive family services team, which will assist Mother in working toward completing the FSP.
 Cooperate with the conditions of parole.
 Cooperate with an in-home team through Catholic Charities.
 Attend weekly visitation and interact appropriately with R.M.G.
The court added a condition in January 2007, instructing Mother to cooperate in obtaining a psychological evaluation and follow all recommendations.
¶ 4 CYS also created a family service plan ("FSP"), pursuant to which Mother was to:
 Notify CYS of any changes in household composition.
 Allow announced and unannounced home visits by CYS.
 Cooperate with weekly visitation.
 Sign all necessary releases.
 Attend parenting classes and follow all recommendations.
 Demonstrate and apply parenting skills during the visit.

*343  Actively participate in couples therapy with an appropriate provider.
 Maintain current employment.
 Pay all bills on time and maintain a monthly budget.
 Follow all recommendations from Early Intervention.
The conditions and FSP requirements were designed to meet the goals of (1) cooperating with CYS, (2) demonstrating knowledge and understanding of R.M.G.'s developmental needs and learning effective parenting skills, (3) maintaining healthy relationships, (4) maintaining safe, independent housing, and (5) cooperating with Early Intervention and all of R.M.G.'s medical needs.
¶ 5 After the initial dependency hearing on November 1, 2006, the court held permanency review hearings on January 12, 2007; July 6, 2007; December 20, 2007, June 17, 2008; and December 17, 2008. At each review, the court or the special master conducting the hearings found CYS had made reasonable efforts; in contrast, Mother had made only partial progress after January 2007 toward alleviating the circumstances requiring placement. She was unsuccessfully discharged from in-home services on March 28, 2007 and was evicted from her home.
¶ 6 CYS filed a petition for a goal change and involuntary termination of Mother's rights to J.M.M. on September 14, 2007. On January 25, 2008, the court granted the petition, in part, because the court continued to have "serious concerns regarding Mother's choice of relationships and anger management issues." The court also had concerns regarding Mother's ability to meet J.M.M.'s special needs. The Superior Court affirmed the decision on October 9, 2008. Mother filed a petition for allowance of appeal with the Pennsylvania Supreme Court, which was denied. In re J.M., 964 A.2d 451 (Pa.Super.2008), appeal denied, 601 Pa. 680, 970 A.2d 431 (2009).
¶ 7 On September 12, 2008, Mother filed a petition for a protection from abuse order against R.M.G.'s father ("Father"), alleging several years of physical and verbal abuse. Father was also charged with simple assault and terroristic threats and received a five (5) to twenty-three (23) month sentence on February 2, 2009.
¶ 8 On September 16, 2008, CYS filed petitions requesting a goal change to adoption and the involuntary termination of Mother's parental rights with respect to R.M.G. The goal-change petition alleged (1) R.M.G. was in foster care since October 2006; (2) Mother lacked the ability to make safe, appropriate decisions for herself and her children, and (3) Father was not a resource for R.M.G. The court held a hearing on November 17, 2008 regarding the goal change petition, but decided to continue the matter, in part due to Mother's pending appeal to the Supreme Court regarding J.M.M. The court also instructed the parties to discuss and identify the disputed facts prior to the next hearing.
¶ 9 The court held a second hearing regarding CYS' petitions on August 5, 2009. At the hearing, all parties submitted a stipulation to the court, whereby the agency dropped its averments based on Sections 2511(a)(1), (2), (5), and (8), without prejudice; and the parties stipulated to the existence of aggravated circumstances required for Section 2511(a)(9). The parties agreed the primary issue for the court was R.M.G.'s best interests under Section 2511(b).
¶ 10 CYS presented caseworker Tara Deane, who testified she had worked with Mother and her family for the six months prior to the hearing. Ms. Deane said Mother regularly attended weekly supervised visits but failed to progress to unsupervised *344 visits. Ms. Deane explained Mother had difficulty setting rules and boundaries during visits. Ms. Deane also testified R.M.G. has a strong bond with J.M.M. and her foster mother. At the conclusion of visitation with her natural mother, R.M.G. would excitedly run toward her foster mother. In contrast, Ms. Deane did not once observe R.M.G. run toward Mother. R.M.G. calls her foster mother "Mom."
¶ 11 Ms. Deane offered her opinion that Mother was not yet ready to assume custody of R.M.G. because of Mother's penchant for abusive relationships and failure to demonstrate she was capable of keeping the children safe. CYS conducted a risk assessment, which determined Mother's children would be at risk in Mother's custody. Ms. Deane also recommended a goal change and termination because it would best serve R.M.G.'s need for permanency.
¶ 12 Mother testified at the hearing. She described her positive interactions with R.M.G. during visits. Mother also testified about her compliance with FSP goals, as well as her completion of classes in anger management, money management, and parenting skills. She stated she is ready to resume custody of R.M.G. Mother testified she is very patient and able to constructively deal with her anger. Mother also testified she ended her relationship with Father in September 2008.
¶ 13 By order entered August 24, 2009, the court denied CYS' petitions. With respect to Father, the court confirmed his voluntary consent to adoption on May 12, 2009. CYS filed a timely notice of appeal and a Rule 1925 concise statement on September 22, 2009.
¶ 14 CYS raises two issues for our review:
WHETHER THE [ORPHANS'] COURT ERRED IN FAILING TO FIND THAT YORK COUNTY [CYS] PRESENTED CLEAR AND CONVINCING EVIDENCE TO CHANGE THE GOAL FROM REUNIFICATION TO PLACEMENT FOR ADOPTION?
WHETHER THE [ORPHANS'] COURT ERRED IN FAILING TO FIND THAT YORK COUNTY [CYS] PRESENTED CLEAR AND CONVINCING EVIDENCE THAT (A) MOTHER WAS CONVICTED OF A CRIME (A FELONY UNDER 18 PA. C.S. § 2702) IN WHICH THE VICTIM WAS A CHILD OF MOTHER, AND (B) TERMINATION OF PARENTAL RIGHTS WOULD SERVE THE BEST INTEREST[S] IN THE DEVELOPMENTAL, PHYSICAL, AND EMOTIONAL NEEDS AND WELFARE OF THE MINOR CHILD?
(CYS' Brief at 5).
¶ 15 For purposes of disposition, we address CYS' issues together. CYS argues R.M.G.'s best interests compel a goal change to adoption. As of August 2009, R.M.G. had been in placement for 33 months. CYS avers Mother only partially complied with the goals outlined for reunification. She continues to struggle to make appropriate choices and continues involvement in domestically violent relationships. Throughout the history of the case, CYS made reasonable efforts at reunification, but Mother was no closer to reunification than she was at the time of the adjudication of dependency. For example, Mother has been unable to progress to unsupervised visitation. With respect to the involuntary termination of Mother's parental rights, CYS argues 23 Pa.C.S.A. § 2511(a)(9) is satisfied, because the parties stipulated Mother was convicted of a felony involving her first child.
¶ 16 CYS also avers termination of Mother's parental rights serves R.M.G.'s *345 needs and welfare under 23 Pa.C.S.A. § 2511(b). Although Mother consistently visited with R.M.G., she remained uninvolved in R.M.G.'s medical or dental treatment. CYS maintains Mother is still not ready for unsupervised visitation, and the history of domestic violence in Mother's home precludes placing a minor child there. Because "Mother does not currently meet any [of R.M.G.'s] emotional, developmental, or physical needs" after 33 months, CYS contends termination, and the opportunity for a permanent home, would best serve R.M.G.'s needs and welfare. Preadoptive resources have been identified for R.M.G., and she has no parental bond with Mother. In contrast, there is evidence R.M.G. is bonded to J.M.M., with whom she currently resides in foster care. CYS concludes its evidence was sufficient to support a goal change and involuntary termination of Mother's parental rights. For the following reasons, we agree with CYS' contentions.
¶ 17 On appeal, goal change decisions are subject to an abuse of discretion standard of review. In re N.C., 909 A.2d 818, 822 (Pa.Super.2006).
In order to conclude that the trial court abused its discretion, we must determine that the court's judgment was "manifestly unreasonable," that the court did not apply the law, or that the court's action was "a result of partiality, prejudice, bias or ill will," as shown by the record. We are bound by the trial court's findings of fact that have support in the record. The trial court, not the appellate court, is charged with the responsibilities of evaluating credibility of the witness and resolving any conflicts in the testimony. In carrying out these responsibilities, the trial court is free to believe all, part, or none of the evidence. When the trial court's findings are supported by competent evidence of record, we will affirm, "even if the record could also support an opposite result."
Id. at 822-23 (internal citations omitted).
¶ 18 The Juvenile Act controls the disposition of dependent children. In re R.P., 957 A.2d 1205, 1217 (Pa.Super.2008). Section 6351 provides in relevant part:
§ 6351. Disposition of dependent child
* * *
(f) Matters to be determined at permanency hearing.At each permanency hearing, a court shall determine all of the following:
(1) The continuing necessity for and appropriateness of the placement.
(2) The appropriateness, feasibility and extent of compliance with the permanency plan developed for the child.
(3) The extent of progress made toward alleviating the circumstances which necessitated the original placement.
(4) The appropriateness and feasibility of the current placement goal for the child.
(5) The likely date by which the placement goal for the child might be achieved.
(5.1) Whether reasonable efforts were made to finalize the permanency plan in effect.
(6) Whether the child is safe.
* * *
(9) If the child has been in placement for at least 15 of the last 22 months or the court has determined that aggravated circumstances exist and that reasonable efforts to prevent or eliminate the need to remove the child from the child's parent, guardian or custodian or to preserve and reunify the family need not be made or continue to be made, whether the county *346 agency has filed or sought to join a petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child unless:
(i) the child is being cared for by a relative best suited to the physical, mental and moral welfare of the child;
(ii) the county agency has documented a compelling reason for determining that filing a petition to terminate parental rights would not serve the needs and welfare of the child; or
(iii) the child's family has not been provided with necessary services to achieve the safe return to the child's parent, guardian or custodian within the time frames set forth in the permanency plan.
* * *
(f.1) Additional determination.Based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following:
(1) If and when the child will be returned to the child's parent, guardian or custodian in cases where the return of the child is best suited to the safety, protection and physical, mental and moral welfare of the child.
(2) If and when the child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.
(3) If and when the child will be placed with a legal custodian in cases where the return to the child's parent, guardian or custodian or being placed for adoption is not best suited to the safety, protection and physical, mental and moral welfare of the child.
(4) If and when the child will be placed with a fit and willing relative in cases where return to the child's parent, guardian or custodian, being placed for adoption or being placed with a legal custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.
(5) If and when the child will be placed in another living arrangement intended to be permanent in nature which is approved by the court in cases where the county agency has documented a compelling reason that it would not be best suited to the safety, protection and physical, mental and moral welfare of the child to be returned to the child's parent, guardian or custodian, to be placed for adoption, to be placed with a legal custodian or to be placed with a fit and willing relative.
(f.2) Evidence.Evidence of conduct by the parent that places the health, safety or welfare of the child at risk, including evidence of the use of alcohol or a controlled substance that places the health, safety or welfare of the child at risk, shall be presented to the court by the county agency or any other party at any disposition or permanency hearing whether or not the conduct was the basis for the determination of dependency.
(g) Court order.On the basis of the determination made under subsection (f.1), the court shall order the continuation, modification or termination of placement or other disposition which is best suited to the safety, protection and physical, mental and moral welfare of the child.
*347 42 Pa.C.S.A. § 6351(f), (f.1), (f.2), (g). Although the agency has the burden to show a goal change would serve the child's best interests, "[s]afety, permanency, and well-being of the child must take precedence over all other considerations" under Section 6351. In re D.P., 972 A.2d 1221, 1227 (Pa.Super.2009), appeal denied, 601 Pa. 702, 973 A.2d 1007 (2009) (emphasis in original); In re S.B., 208 Pa.Super. 21, 943 A.2d 973, 978 (2008), appeal denied, 598 Pa. 782, 959 A.2d 320 (2008). "[T]he parent's rights are secondary" in a goal change proceeding. In re D.P., supra.
¶ 19 Because the focus is on the child's best interests, a goal change to adoption might be appropriate, even when a parent substantially complies with a reunification plan. In re N.C., supra at 826-27. Where a parent's "skills, including her judgment with regard to the emotional well-being of her children, remain problematic[,]" a goal change to adoption might be appropriate, regardless of the parent's compliance with a permanency plan. Id. at 825. The agency is not required to offer services indefinitely, where a parent is unable to properly apply the instruction provided. In re A.L.D., 797 A.2d 326, 340 (Pa.Super.2002). See also In re S.B., supra at 981 (giving priority to child's safety and stability, despite parent's substantial compliance with permanency plan); In re A.P., 728 A.2d 375, 379 (Pa.Super.1999), appeal denied, 560 Pa. 693, 743 A.2d 912 (1999) (holding where, despite willingness, parent cannot meet "irreducible minimum parental responsibilities, the needs of the child must prevail over the rights of the parent"). Thus, even where the parent makes earnest efforts, the "court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." In re Adoption of R.J.S., 901 A.2d 502, 513 (Pa.Super.2006).
¶ 20 Appellate review of cases involving termination of parental rights are subject to the following principles:
[O]ur scope of review is broad and comprehensive, but our standard of review is narrow. We consider all the evidence, along with the legal conclusions and factual findings of the trial court. We reverse only if we find an abuse of discretion, an error of law, or insufficient evidentiary support. With respect to evidentiary support, we determine only whether the trial court's findings are supported by competent evidence. We accord the hearing judge's decision the same deference that we would give to a jury verdict.
In re C.P., 901 A.2d 516, 520 (Pa.Super.2006) (citing In re C.M.S., 884 A.2d 1284, 1286 (Pa.Super.2005), appeal denied, 587 Pa. 705, 897 A.2d 1183 (2006)). Further,
[i]n a proceeding to involuntarily terminate parental rights, the burden of proof is upon the party seeking termination to establish by "clear and convincing" evidence the existence of grounds for doing so. The standard of "clear and convincing" evidence is defined as testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.
In re A.L.D., supra at 336 (quoting In re Adoption of Atencio, 539 Pa. 161, 166, 650 A.2d 1064, 1066 (1994)).
¶ 21 CYS stipulated to proceed on its petition to terminate Mother's parental rights on the following ground:
§ 2511. Grounds for involuntary termination
(a) General Rule.The rights of a parent in regard to a child may be terminated *348 after a petition filed on any of the following grounds:
* * *
(9) The parent has been convicted of one of the following in which the victim was a child of the parent:
(i) an offense under 18 Pa.C.S. Ch. 25 (relating to criminal homicide);
(ii) a felony under 18 Pa.C.S. § 2702 (relating to aggravated assault);
(iii) an offense in another jurisdiction equivalent to an offense in subparagraph (i) or (ii); or
(iv) an attempt, solicitation or conspiracy to commit an offense in subparagraph (i), (ii) or (iii).
(b) Other considerations.The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.
* * *
23 Pa.C.S.A. § 2511(a)(9); (b). Therefore, the test for termination of parental rights has two parts. In re Adoption of J.M., 991 A.2d 321, 323 (Pa.Super.2010).
Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of... her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.
In re L.M., 923 A.2d 505, 511 (Pa.Super.2007) (internal citations omitted). "[A] parent's basic constitutional right to the custody and rearing of ... her child is converted, upon the failure to fulfill ... her parental duties, to the child's right to have proper parenting and fulfillment of... her potential in a permanent, healthy, safe environment." In re B., N.M., 856 A.2d 847, 856 (Pa.Super.2004), appeal denied, 582 Pa. 718, 872 A.2d 1200 (2005).
¶ 22 Under Section 2511(b), the court must consider whether the child's needs and welfare will be met by termination. In re C.P., supra.
Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of the child. The court must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond.
Id. at 520 (internal citation omitted). Concern for the child's welfare must remain the court's focus under Section 2511(b), regardless of a parent's progress toward completing FSP goals. See In re I.J., 972 A.2d 5, 12 (Pa.Super.2009). This Court has held the "demonstration of mere progress towards reunification cannot form the basis of a `best interests' analysis...." Id. (discussing both 23 Pa.C.S.A. § 2511(a)(8) and (b)).
¶ 23 Section 2511(b) also contains evidentiary limitations: "In the last sentence of subsection (b), we are instructed *349 that we may not consider any effort by the parent to remedy the conditions described in subsections (a)(1), (a)(6) or (a)(8) if that remedy was initiated after the parent was given notice that the termination petition had been filed." In re D.W., 856 A.2d 1231, 1234 (Pa.Super.2004). Further, this evidentiary limitation "applies to the entire termination analysis." Id. The court may consider post-petition efforts if the efforts were initiated before the filing of the termination petition and continued beyond the petition date; but a "parent's avowed intent to cooperate in a remediation program at the eleventh hour, after a long period of uncooperativeness ... may properly be rejected as untimely and/or insincere." Id. at 1235 (discussing In re K.C.W., 456 Pa.Super. 1, 689 A.2d 294 (1997)). In re J.W., 396 Pa.Super. 379, 578 A.2d 952, 959 (1990).
¶ 24 Additionally, this Court has recognized a connection between the involuntary termination of parental rights and the Adoption and Safe Families Act ("ASFA"), the stated policy of which is
[T]o remove children from foster placement limbo where they know neither a committed parent nor can [they] look toward some semblance of a normal family life that is legally and emotionally equivalent to a natural family.... States such as Pennsylvania, which participate in the program, are required to return the child to its home following foster placement, but failing to accomplish this due to the failure of the parent to benefit by such reasonable efforts, to move toward termination of parental rights and placement of the child through adoption. Foster home drift, one of the major failures of the child welfare system, was addressed by the federal government by a commitment to permanency planning, and mandated by the law of Pennsylvania in its participation in the Adoption and Safe Families Act of 1997. Succinctly, this means that when a child is placed in foster care, after reasonable efforts have been made to reestablish the biological relationship, the needs and welfare of the child require CYS and foster care institutions to work toward termination of parental rights, placing the child with adoptive parents. It is contemplated this process realistically should be completed within 18 months.
In re G.P.-R., 851 A.2d 967, 975-76 (Pa.Super.2004) (quoting In re B.L.L., 787 A.2d 1007, 1016 (Pa.Super.2001)) (emphasis added). Essentially, this legislation shifted away from an "inappropriate focus on protecting the rights of parents" to the priority of the "safety, permanency and well-being" of the child. In re C.B., 861 A.2d 287, 295 (Pa.Super.2004), appeal denied, 582 Pa. 692, 871 A.2d 187 (2005). "While this 18-month time frame may in some circumstances seem short, it is based on the policy that a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." In re N.C., supra at 824 (internal citations and quotation marks omitted).
¶ 25 Instantly, the parties have stipulated Section 2511(a) was met; therefore, we focus our review on subsection (b). The Orphans' court evaluated Mother's case, in relevant part, as follows:
[T]he [c]ourt must ... give primary consideration to the developmental, physical, emotional needs, and welfare of the child and determine what is the best interest[s] of the child.
The appeal doesn't set forth exactly why the [c]ourt erred in regard to those ... considerations.
The [c]ourt will concede that [M]other's assault on her infant son eleven years ago (especially with its serious consequences) *350 raises a question about whether this child might be in danger of a similar fate. Back at the time when the child was found dependent when [M]other was still on parole supervision and had not yet completed her counseling requirements, that danger was at [its] highest point. Despite that the Judge set the goal at reunification.
Since that time the danger has arguably decreased. Mother successfully completed parole supervision, which included counseling requirements. Mother refrained from any further criminal violations. Mother completed all of the goals set by the agency to attempt to achieve reunification with her child. Finally [M]other through her babysitting successfully carried out duties similar to being the parent of a child.
Therefore the [c]ourt felt constrained to say that if [M]other was deemed suitable for reunification at the time of finding of dependency then she must still be suitable for reunification several years later when her circumstances are that much better. While the risk that [M]other might harm the child will always exist based on the conviction for aggravated assault, that risk has been reduced by the passage of time and circumstances.
The [c]ourt is required to determine what is in the best interest[s] of the child. That is hard to do in this case because the agency made no effort to carry out the [c]ourt created goal of reunification. The agency essentially decided that it was too dangerous to trust the child with [M]other and placed every barrier in place of reunification that it could, intending to move for termination when it was permissible to do so.
The agency now contends that there is no bond between [M]other and child and that there is a closer relationship between the child and foster mother. This is true but only because the agency has so severely limited contact between [M]other and child that it was impossible for her to form a bond with the child.
Essentially the agency is trying to reverse the decision three years ago when the Judge set the goal at reunification instead of termination. The only thing offered by the agency is the same criminal conviction that was offered at that time despite the fact that everything that has happened since then has made the case more favorable to [M]other.
It makes no sense to have a goal of reunification three years ago requiring [M]other to jump through hoops to meet goals throughout that time period, and when she has met those goals to tell her that it makes no difference we are going to terminate your rights anyway.
The best interest[s] of the child are difficult to determine in this situation. The testimony of the newly appointed case worker was extremely limited. There is little information on interactions between [M]other and child because the agency has strictly limited their contact. It seems the only way the [c]ourt will ever know if reunification can occur would be if the agency made a good faith effort at reunification, and actually gave [M]other an opportunity to prove her capability to be a parent.
It may be that [M]other won't be able to succeed. She faces considerable hardships in regard to employment because of her criminal conviction and her lack of [an] employment history. However, you can't ignore the significant effort mother has made during the last three years to find and maintain employment, find and maintain housing, and complete counseling. Further [M]other actually has children of the approximate age of her child *351 in her care without any problems having occurred.
This Judge's real problem deciding this case is that I think I would have made a different decision than the Judge who three years ago set the goal at reunification. I simply would have thought that the possibility of another assault by [M]other was such a risk that reunification should never occur.
However I think the previous Judge's decision to set the goal at reunification establishes the law of the case, and I acknowledge that everything that has happened since then is favorable to [M]other['s] position. Therefore from the starting point of three years ago that reunification is the goal, I can only conclude that reunification should remain the goal.
If I were to ignore the decision from three years ago and simply evaluate the present testimony I would have a much more difficult time deciding the case. Because of the changes which occurred since that time, I would not conclude (as I think I would have three years ago) that the risk of assaultive behavior on the child by [M]other should absolutely prevent reunification.
Whether it is in the best interest[s] of the child for reunification to occur is a much closer decision. While the potential that assaultive behavior by [M]other will occur is lower, it still exists. While [M]other has obtained employment and housing, there is still a risk that because of her limitations, she will never be able to maintain a job and housing at the level necessary to support this child.
The problem is simply that the [c]ourt was not provided with sufficient information to determine what the best interests of the child are, and therefore the agency has not met it[s] burden to show that parental rights should be terminated.
The tie breaker which tips the balance in favor of [M]other is simply that it is not fair to lead [M]other on for three years to believe that reunification may occur, and never give her a realistic opportunity to achieve that goal.
(Orphans' Court Opinion, filed August 24, 2009, at 4-7). After careful review of the record, in light of the applicable law, we respectfully disagree with the court's decision. The record does not support the conclusion that Mother met all reunification goals, or that reunification serves R.M.G.'s best interests. See 42 Pa.C.S.A. § 6351; 23 Pa.C.S.A. § 2511(b). Specifically, our independent review of the record revealed the following.
¶ 26 R.M.G. entered foster care on October 23, 2006, due to Mother's parole conditions restricting her contact with minors. Subsequent CYS services were designed to help Mother create a safe and stable home. Both the court-ordered requirements and the family service plan ("FSP") reflect this focus. The record indicates Mother failed to meet these goals, despite CYS' reasonable efforts. Most significantly, the record contains clear and convincing evidence that Mother had not developed sufficient parenting skills, or managed to create a safe and stable home for a child.
¶ 27 Despite receiving years of CYS services, Mother did not progress to unsupervised visitation. Originally, the limited contact resulted from Mother's parole conditions. Mother's own actions, in perpetrating child abuse, caused her parole limitations. See In re Z.P., 994 A.2d 1108, 1120 (2010) (citing In re C.L.G., 956 A.2d 999, 1006 (Pa.Super.2008) (en banc)) (stating "cause of incarceration may be particularly relevant ... where imprisonment arises as a direct result of actions" originally necessitating child's placement). *352 Moreover, even after this restriction was lifted, CYS required supervision because Mother did not demonstrate proper parenting skills during her visits with R.M.G. Caseworker Tara Deane testified Mother had difficulty setting rules and boundaries during visits with J.M.M. and R.M.G. Ms. Deane explained:
[MS. DEANE]: [J.M.M.] and [R.M.G.] are very active, and [Mother] had a hard time setting rules and [boundaries]. There was a few times I've had to go into the room, because one child was screaming and crying, to let [Mother] know she needs to set some rules and [boundaries] before one of these children really get[s] hurt.
[COUNSEL FOR CYS]: Did you have to prompt her on numerous occasions, or was that kind of a unique or rare incident where she had to be prompted?
[MS. DEANE]: That I recall, I believe it was at least two times that I did, so
[COUNSEL FOR CYS]: And have you observed the visits between [R.M.G.] and [Mother] now that it's just the two of them?
[MS. DEANE]: Yes.
[COUNSEL FOR CYS]: And how are those visits different from when [J.M.M.] was involved?
[MS. DEANE]: Well, [R.M.G.] then had a playmate, so she had [J.M.M.] to interact with, because during some of the visit, [Mother] does tend to sit there sometimes. She does interact and read books sometimes, but she does tend to sit there. I don't see an instant affection between the two of them, and I do know when foster mom arrives, [R.M.G.] is very excited and ready to go.
[COUNSEL FOR CYS]: What is [R.M.G.]'s demeanor when she sees [Mother]?
[MS. DEANE]: She's very quiet. NotI don't see much excitement. She is kind of quiet and to herself.
(See N.T. Hearing, 8/5/09, at 30-31.) When Mother's counsel asked whether Ms. Deane could articulate any specific problems, she described a February 5, 2009 visit, where the children were fighting and standing on desks and chairs, but Mother did nothing to intervene. One of the children eventually fell off of a chair. (See id. at 48.)
¶ 28 Ms. Deane also testified regarding the effect on R.M.G. of termination:
THE COURT: What factual observations have you made that would let the Judge decide whether or not it's in the best interests of the child to be with the parent ...?
[MS. DEANE]: The bond that she obviously has with the foster mother that I see; the bond that she has with her biological brother, who also resides in the home; the lack of affection and lack of excitement that I do see between [Mother] and [R.M.G.] when they do have a visit, and some lack of interaction, too, during the visit.
(Id. at 39).
¶ 29 Mother's ability to meet R.M.G.'s needs is likewise limited by her anger management issues. Following the termination proceedings regarding J.M.M. in January 2008, the court determined:
Mother had made minimal progress towards dealing with her "anger-type" issues. Anger management was an important area of focus for the In-Home Team due to Mother's history of not managing her anger with her first child. Furthermore, the Team found Mother's progress in expressing her feelings to be minimal. Mother testified at the hearing that she had made progress on dealing with her anger and now she channels her frustration into productive activities, *353 such as cleaning her house. However, Mother also testified that she has been asked to leave her last two jobs because customers complained about her attitude. Mother denied that she was rude to customers and claims it was a coincidence that her last two employers had similar complaints. Based on the evidence, this court does not believe Mother has made satisfactory progress in dealing with her anger.
The Family Service Team also wished to see Mother make progress in her communication with others. Mother has a history of unhealthy relationships that lead to an unstable home for children. Mother volunteered to her therapist that she would become frustrated with her children and did not know how to respond to their cries. The In-Home Team addressed these concerns with Mother and recommended that, when [M]other feels frustration, she should reach out for the help of others. However, when the Team closed, Mother was not any closer to having unsupervised contact with her children. Although Mother is restricted by her parole until June 2008, testimony elicited at the hearing was that Mother continues to keep feelings of frustration to herself. For example: Mother failed to inform her caseworker and In-Home Team that she was being evicted. Instead of reaching out for help, Mother let the situation worsen until she was evicted. Again, Mother has not made sufficient progress towards alleviating [the] concerns that initiated placement of the minor child.
(Adjudication, dated 1/25/08, at 10-11). At the August 2009 hearing, Mother conceded she attended no additional counseling, therapy or anger management classes since January 2008. (See N.T. Hearing, 8/5/09, at 78-79.) She simply asserted she no longer has any anger management issues:
[COUNSEL FOR MOTHER]: Now ... it was mentioned that Judge Kelley referenced an anger issue. Do you feel you today continue to have any anger issues?
[MOTHER]: No, I don't.
[COUNSEL FOR MOTHER]: Why not?
[MOTHER]: Because when something bothers me, yeah, it takes me a while to calm down enough that I can speak about it, but when I do speak about it, I let the person or persons know, "Hey, you upset me with this, and this is why."
(See id. at 72-73.) Upon cross examination, Mother continued:
[GUARDIAN AD LITEM]: And you said that it takesit takes a while for you to calm down, correct?
[MOTHER]: Yes.
[GUARDIAN AD LITEM]: How long is a while?
[MOTHER]: About five minutes.
[GUARDIAN AD LITEM]: Were you angry when you injured your first son?
[MOTHER]: Yes, I was, but I wasn't angry at him. I was angry at his father and the situation that we were going through.
(Id. at 83).
¶ 30 Therefore, the totality of the circumstances strongly suggests Mother was still not ready to assume custody of R.M.G. Despite attending seminars, counseling, and classes, she had not developed sufficient skills to care for R.M.G. during 90-minute unsupervised visits, much less full time. See In re I.J., supra (holding progress toward FSP goals cannot form basis of best interests analysis); In re N.C., supra at 825 (holding goal change to adoption may be appropriate even where parent substantially complies with reunification plan). See also In re J.W., supra at *354 960 (holding CYS has duty to promote reunification by providing assistance to parents but has no obligation to guarantee success of parent's efforts). Ms. Deane established valid reasons for continuing to require supervised visits. In contrast, Mother's evidence regarding her occasional babysitting responsibilities was inadmissible and should not have been considered. See In re A.L.D., supra at 338 (holding: "evidence concerning a parent's ability to care for another child is irrelevant and inadmissible in a proceeding to terminate parental rights with regard to the child at issue"). Moreover, even if properly considered, Mother's success in babysitting older children for limited time periods simply does not indicate she is capable of full-time custody of a two year old child.
¶ 31 A second issue affecting Mother's ability to meet R.M.G.'s needs and welfare involves Mother's tolerance of domestic violence that persisted in Mother's relationship with Father for several years immediately preceding the termination petition. Father physically and verbally abused Mother for years. In her September 12, 2008 PFA petition, Mother described the verbal and physical attacks. For example, the petition alleged the following occurred in December 2006:
[Father] wanted sex from [Mother] and she said no, because she wanted to be left alone. [Father] punched [Mother] in the left eye, and [Mother] was trying to get [Father] off of her. [Father] kept holding [Mother] down, calling her a slut and whore. [Mother]'s nose started bleeding, and she was throwing up after [Father] hit her.... [Father] started choking [Mother] and she blacked out, and she woke up shaking, like a seizure. [Mother]'s whole left eye was swollen shut and she had a bruise on her jaw from this incident.... [Father] has told [Mother] that if she ever tries to call 911, that he would kill her before she even finished pushing 911.
(See CYS' Exhibit 3). Mother reported additional incidents of violence occurring between 2007 and 2008. As recently as September 10, 2008, an altercation with Father left Mother with a fractured right shoulder and multiple bruises and swelling to her face and body.
¶ 32 Mother's testimony at the termination hearing confirmed she was involved with Father from November 2, 2005 through September 10, 2008, and suffered ten incidents of violence. (See N.T. Hearing, 8/5/09, at 87, 91.) She explained:
[MOTHER]: [Father] abused me for two years, from December 2006, to September, 2008. I filed January, 2008, a PFA against [Father], and the temporary one was not granted, but the final one was granted for two years, and I withdrew that petition, which I was wrong for. The reason I did was because I thought [Father] changed, it would not happen again. I was wrong. September 10th, 2008, proved it, when [Father] nearly choked me to death and broke my arm....
(See id. at 87.) When asked about the September 2008 altercation, Mother testified she suffered bruises on her face, choke marks on her neck, humerus fractures, scratches, and a bite to her tongue. (Id. at 88). As a result, Father has been incarcerated on charges of simple assault and terroristic threats. (Letter, dated 11/18/08, attached to Permanency Review Order, 12/1/08).
¶ 33 Mother's history of domestic violence casts serious doubt on her ability to establish a home that would be safe and stable for R.M.G. The Orphans' court acknowledged this dilemma:
I would also agree that the fact that [M]other becomes involved in abusive relationships, and the implication is *355 there have been multiple ones, the proof is there is one that went on for an extensive period of time, does indicate some possibility that because [M]other's not in control, if she were to get into another abusive relationship, the child potentially would be in danger.
* * *
So I guess we can say [Mother] may get in a relationship with a guy in the future... and she may get mad and upset and she may take it out on the child, intentionally or otherwise, or she may get involved in an abusive relationship and put herself in danger and put the child in danger, as well.
(See N.T. Hearing, 8/5/09, at 108-09.) The court also stated it did not deem the possibility of future domestic violence unlikely. (See id. at 112.)
¶ 34 Thus, the record, as well as the court's own factual findings, undermine its decision that reunification and preservation of Mother's parental rights serves R.M.G.'s best interests. Instead, we conclude the record contains clear and convincing evidence that returning R.M.G. to an abusive home, whether perpetrated by Mother or a paramour, does not best serve the child's needs and welfare. See 42 Pa. C.S.A. § 6351; 23 Pa.C.S.A. § 2511(b). See also In re Z.P., supra at ¶ 13 (holding court may terminate parental rights, even where parent has never had custody, if placement with natural parent would risk physical or mental harm to child). The court's only concern should have been identifying the outcome that would best serve R.M.G.'s welfare. See In re I.J., supra at 12; In re S.B., supra at 981; In re N.C., supra at 824.
¶ 35 R.M.G.'s foster family and natural brother are the only consistent family she has ever known, and she is entitled to permanency. Mother's ability to assume custody remains entirely speculative. Mother's own testimony is the only evidence of a bond between Mother and R.M.G., and the court indicated it questioned the credibility of this testimony:
¶ 36 I'm not sure how much I buy [M]other's statement that
the child comes running to her. I'm more inclined to accept the caseworker's statement, that there is not the greatest response, but I wouldn't expect anything else. What else could happen under the circumstances?
(See N.T. Hearing, 8/5/09, at 110.) Under these circumstances, the ASFA requires the court to move toward adoption and termination of Mother's parental rights, and the court's refusal to do so was an abuse of discretion. See In re C.B., supra; In re G.P.-R., supra. "Fairness" to Mother at this juncture is no longer a relevant consideration.
¶ 37 Thus, the record demonstrates adoption and termination are in R.M.G.'s best interests. For the foregoing reasons, we conclude sufficient evidence supported a goal change and involuntary termination of Mother's parental rights. Accordingly, we reverse.
¶ 38 Order reversed; case remanded for appropriate disposition. Jurisdiction is relinquished.
NOTES
[1] Mother has two other children, K.R. and J.M.M. Her parental rights with respect to these two other children were previously terminated and are not at issue on appeal.