J-S61016-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: B.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: N.D., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1864 EDA 2019 |

Appeal from the Order Entered June 5, 2019
In the Court of Common Pleas of Philadelphia County Family Court at
No(s):  CP-51-DP-0000862-2015

BEFORE:   BOWES, J., OLSON, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY OLSON, J.:                **FILED JANUARY 15, 2020**

Appellant, N.D. ("Mother"), appeals from the June 5, 2019 order granting Philadelphia Department of Human Services' ("DHS") petition  to change the permanency goal with respect to her child, B.D.[1] ("Child"), from reunification to Another Planned Permanent Living Arrangement ("APPLA"). We affirm.

The trial court set forth the relevant factual and procedural background of this matter as follows.

> On March 9, 2015, DHS received a [General] Protective Services ("GPS") Report, alleging [the following:] [] Child[, who is severely intellectually  disabled,  blind,  and  non-verbal]  was  receiving

---

[*] Former Justice specially assigned to the Superior Court.

[1] Child was born in May 2001.  Trial Court Opinion, 8/14/19, at 1.  The trial court adjudicated Child dependent when he was 13-years-old.  During the permanency  review  hearing  conducted  on  June  5,  2019,  Child  was 18-years-old.

Risperdal medication from his pediatrician twice a day [but had not been] seen [by] his pediatrician for about [three to four] weeks and therefore[,] had not received his medication; that [] Child's Mother [] stated that she had been unable to keep an appointment for [] Child; that [] Child had become extremely aggressive toward himself and others; that on [February 26, 2015,] he was extremely aggressive and was transported to the hospital and that two security officers were needed to restrain him while he was sedated; that he was prescribed medication at the hospital but it is unknown if Mother [was] giving it to him[;] that [] Child's aggressive behavior [] continued throughout that week; that Mother [failed to keep] multiple appointments at [] Child's school to discuss his medical situation; that Mother failed to retrieve [] Child from the school bus [nine] times during this school year and he was suspended from traveling on the school bus; that [] Child needs to be met at the bus stop because of his disabilities; that he had to wait at the school bus depot at the end of the route to be retrieved; that Mother stated that she had been working and was unable to retrieve him at his bus stop; that [] Child often attends school unbathed and in an unchanged diaper from the previous day; [and] that Mother stated that his diapers were in storage. The [r]eport further alleged that [] Child . . . charged at the school staff, bit the school staff, and bit himself.

[On that same day], DHS met with Mother, who stated that she [] filled [] Child's prescription on [February 23, 2015]. She stated that he receive[d] his medication twice daily and that she and his teacher were attempting to increase his dosage to three times [a day]. …Mother stated that [] Child exhibits extremely aggressive behavior and ha[d] hit her in the past, causing black eyes and split lips. She stated that she [was] unable to work consistently because of [] Child's needs and that she might face eviction because she is unable to afford her rent. DHS observed the home as appropriate and that Child's siblings were safe.

On or before March 20, 2015, [] Child was admitted to the Children's Hospital of Philadelphia ("CHOP") Child and Adolescent Psychiatry and Behavioral Science Unit due to his violent and sexually aggressive behavior.

\*\*\*

On April 6, 2015, [CHOP discharged Child,] and DHS obtained an Order of Protective Custody ("OPC") and placed him at Woods School ("Woods").

[On April 8, 2015, the trial court held a] Shelter Care Hearing. [At that time, the] OPC was lifted and legal custody of [Child] [was] transferr[ed] to DHS. [Child was then placed] in a group home, [Woods.]

Trial Court Opinion, 8/14/19, at 2-3.

The trial court adjudicated Child dependent on April 17, 2015. Trial Court Order, 4/17/15, at 1-2. Thereafter, the trial court conducted permanency review hearings every few months. On June 5, 2019, the trial court conducted a goal change hearing. The trial court summarized the testimony provided during the hearing as follows:

Dr. Erica Williams was the first witness to testify at the hearing. All parties stipulated to her qualifications as an [e]xpert in either child behavior or child placement and as a Forensic Psychologist, specializing in children and youth. [Dr. Williams] testified [that] she performed a Bonding Evaluation of [] Child and [] Mother, and produced a [r]eport dated [May 30, 2019].

Dr. Williams testified [that] she interviewed Mother, [but], did not interview [] Child due to his limitations in being able to interact. She was able to observe Mother and her son, and the observation was consistent with the information she received regarding [] Child's intellectual disabilities, limitations and developmental delays. She [stated that she] had no concerns regarding Mother's interactions with her son, however, [] Child presents with [many] behavioral tendencies that could be safety issues. Mother was aware of them, attune[d] to them and responded to them immediately. After Dr. Williams interviewed Mother and [] Child, she also observed a video called, *The Day [in] the Life of B.D.*, which was filmed at Woods.

Dr. Williams testified [that] Child has been out of Mother's home since 2015, so that specific attachment of the caregiver for [] Child was no longer there, and the caregiver relationship is now with the staff at Woods. The staff is now meeting his daily needs and Mother's visitation is [] an average of two times a month, putting her in the role of visitor instead of caregiver. [Dr. Williams explained that] Child's needs care 24/7, and his physical size makes it difficult for one person to sustain the necessary skills,

- 3 -

energy, and commitment that he would need. Mother [told Dr. Williams that] she could have her son live with her and [] to meet [Child's] needs, she would have occupational therapy and speech therapy still come in to provide one-[on]-one care. Mother's plan was to have him in school and after school have adults [at the house]. However, [Dr. Williams opined that the] problem is, the adults [do not] stay overnight, and would not be there early in the morning, so it becomes a complex task to meet [Child's] every need. Given the Child's size[,] he presents a physical challenge to any caregiver, if he becomes angered then things could happen and he could [over power] many people. So[, Dr. Williams explained that] he would need someone with a certain level of physical strength to engage in behavior modification if he became violent and require[d] hands-on physical redirection.

Dr. Williams opined that based on the interviews, viewing [of] the video and the Bonding Evaluation, [Child] would not suffer irreparable harm if his contact with his Mother would cease because he does not have a caregiver bond with his Mother. [Dr. Williams also stated that Child] has done well under the care given to him at Woods and based on what she knows about his functioning, any move would require extensive planning and complete assurance that the level of care he is receiving now, he would receive where he is going. Dr. Williams state[d that] she did not get those assurances from Mother.

Crystal Atkins, [the Community Umbrella Agency ("CUA")] Tabor Case Manager, was the next witness to testify. She stated [that] she [managed] the case for approximately nine months, and [was] intimately involved with the case. [] [Atkins explained that Child's] home visits with Mother ended by [c]ourt order and have not been reinstated because Mother was not at home to receive [] Child when he was transported from Woods. [] Atkins [also] stated [that] Mother has liberal visitation privileges [at Woods], however, she consulted the visitation log and spoke to supervisors at the Wildwood cottage and the pattern for Mother's visits have been one hour[,] once per month since [Child] was moved to the cottage in February 2019. [Atkins stated that] Mother was not obeying the policies at Woods and attempting to visit after 8:00 p.m.

[] Atkins testified [that] she visited Mother at her home in March 2019, [for a] monthly safety visit for [Child's] sister's case which has since been closed. She found no safety concerns about the home itself. She noted that the [trial c]ourt ordered CUA to assist

Mother in acquiring a new refrigerator, and on [March 20, 2019], the [trial c]ourt ordered Mother to cooperate with CUA to provide a copy of her rental lease, utility bills, and pay stubs. [] Mother has not provided any of that material. [Lastly,] [] Atkins testified that it [was] the CUA's opinion that it [was] in the best interest of [Child to] remain at Woods. [] Child is unable to answer questions and he requires medication and Woods provides care for him and the staff is able to meet all of his needs. CUA recommended to the [trial c]ourt that [] Child's goal be changed to APPLA and have him continue his residency at Woods.

On cross-examination by Andrew Mitnik, Esquire, [] Child['s] Advocate, [] Atkins noted that she arranged for [] Child to receive IDS services because Mother [] neglected to perform the task[, despite being asked to do so.]

Mother was the next witness to testify. She stated [that] she had a plan for her son to return to her home. She focused this plan on her training as a residential advisor and her work with NHS. She [explained that she would] get all of the services in place for his return and obtain a [Therapeutic Support Staff] worker if necessary. She also [noted that she has] various family members who are available to care for [Child] when she is not present, [specifically,] her mother, her sister and her other [c]hildren. [Mother explained that, while she] works for Kids R Us, [] she will build her life around her son and she will lessen her work schedule, if necessary. Regarding her visitation with her Child, [Mother] stated there was no communication barrier, she was not at home once when [Child] was brought to her house to visit and then the home visits were stopped. She reported visiting her son more than twice per month and the entire family goes to visit him at times. Regarding proof of lease and utilities and other [requested] paperwork[,] she stated that unfortunately she did not have that in her possession at the hearing, but stated she could obtain it.

Trial Court Opinion, 8/14/19, at 9-11. Upon hearing the aforementioned testimony, the trial court entered an order changing Child's goal from

reunification to APPLA. Trial Court Order, 6/5/19, at 1-2. This timely appeal followed.[2]

Mother presents the following issues on appeal:

I.   Did the [trial] court err when [it changed the] goal for [C]hild to APPLA when the expert witness did not review the full record?

II.  Did the [trial] court err or abuse its discretion [by] changing [the] goal for [C]hild to APPLA when [it] incorrectly appl[ied] the best interest[] of the child [standard]?

Mother's Brief at 2.

First, Mother claims that the trial court erred by relying upon the testimony of Dr. Williams, the expert witness, in changing the permanency goal for Child from reunification to APPLA. Specifically, Mother argues that Dr. Williams's testimony was "not based on a complete review of the available record and, therefore[,] flawed." Mother's Brief at 7-8. Mother, however, provided no legal authority to support her bald assertion that the trial court erred in relying upon Dr. Williams's testimony. Thus, Mother waived this portion of her argument for lack of development. *See* Pa.R.A.P. 2119

---

[2] On July 1, 2019, Mother filed a notice of appeal, along with concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). The trial court issued an opinion pursuant to Pa.R.A.P. 1925(a) on August 14, 2019.

(requiring a properly developed argument for each question presented including a discussion of and citation to authorities in appellate brief).[3]

Next, Mother contends that the trial court erred by granting DHS's petition to change Child's goal from reunification to APPLA. Mother's Brief at 8-12. We disagree.

It is well established that "goal change decisions are subject to an abuse of discretion standard of review." **In re R.M.G.**, 997 A.2d 339, 345 (Pa. Super. 2010) (citation omitted).

> In order to conclude that the trial court abused its discretion, we must determine that the court's judgment was "manifestly unreasonable," that the court did not apply the law, or that the court's action was "a result of partiality, prejudice, bias or ill will," as shown by the record. We are bound by the trial court's findings of fact that have support in the record. The trial court, not the appellate court, is charged with the responsibilities of evaluating credibility of the witness and resolving any conflicts in the testimony. In carrying out these responsibilities, the trial court is free to believe all, part, or none of the evidence. When the trial court's findings are supported by competent evidence of record,

_____

[3] Even if this issue were not waived, we find no merit in Mother's argument that the trial court erred in relying upon Dr. Williams's testimony. As the trial court noted, Dr. Williams provided "credible, persuasive [e]xpert testimony." Trial Court Opinion, 8/14/19, at 15. Dr. Williams observed Mother and Child and found that the "observation was consistent with the information [Dr. Williams] received regarding [] Child's intellectual disabilities, limitations and developmental delays." **Id.** Dr. Williams noted that she had "no concerns regarding Mother's interaction with [Child]," however, Child's behavioral problems create safety issues. **Id.** Dr. Williams concluded that, due to his significant problems and his size, Child is safer and better cared for in a group home setting. **Id.** The record supports the trial court's findings and the court did not abuse its discretion in relying upon Dr. Williams's testimony. **In re: G.M.S.,** 193 A.3d 395, 402 (Pa. Super. 2018) ("A trial court has discretion to accept or reject a witness' testimony, including that of an expert witness, and is free to believe all, part or none of the evidence presented.").

we will affirm, "even if the record could also support an opposite result."

*Id*. (citations omitted).

A trial court must consider the following factors at a permanency review hearing:

**(f) Matters to be determined at permanency hearing. --** At each permanency hearing, a court shall determine all of the following:

(1) The continuing necessity for and appropriateness of the placement.

(2) The appropriateness, feasibility and extent of compliance with the permanency plan developed for the child.

(3) The extent of progress made toward alleviating the circumstances which necessitated the original placement.

(4) The appropriateness and feasibility of the current placement goal for the child.

(5) The likely date by which the placement goal for the child might be achieved.

(5.1) Whether reasonable efforts were made to finalize the permanency plan in effect.

(6) Whether the child is safe.

(7) If the child has been placed outside the Commonwealth, whether the placement continues to be best suited to the safety, protection and physical, mental and moral welfare of the child.

(8) The services needed to assist a child who is 14 years of age or older to make the transition to successful adulthood.

(8.1) Whether the child continues to meet the definition of "child" and has requested that the court continue jurisdiction pursuant to section 6302 if the child is between 18 and 21 years of age.

(8.2) That a transition plan has been presented in accordance with section 475 of the Social Security Act (49 Stat. 620, 42 U.S.C. § 675(5)(H)).

(9) If the child has been in placement for at least 15 of the last 22 months or the court has determined that aggravated circumstances exist and that reasonable efforts to prevent or eliminate the need to remove the child from the child's parent, guardian or custodian or to preserve and reunify the family need not be made or continue to be made, whether the county agency has filed or sought to join a petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child unless:

> (i) the child is being cared for by a relative best suited to the physical, mental and moral welfare of the child;

> (ii) the county agency has documented a compelling reason for determining that filing a petition to terminate parental rights would not serve the needs and welfare of the child; or

> (iii) the child's family has not been provided with necessary services to achieve the safe return to the child's parent, guardian or custodian within the time frames set forth in the permanency plan.

(10) If a sibling of a child has been removed from his home and is in a different placement setting than the child, whether reasonable efforts have been made to place the child and the sibling of the child together or whether such joint placement is contrary to the safety or well-being of the child or sibling.

(11) If the child has a sibling, whether visitation of the child with that sibling is occurring no less than twice a month, unless a finding is made that visitation is contrary to the safety or well-being of the child or sibling.

(12) If the child has been placed with a caregiver, whether the child is being provided with regular, ongoing opportunities to participate in age-appropriate or developmentally appropriate activities. In order to make the determination under this paragraph, the county agency shall document the steps it has taken to ensure that:

(i) the caregiver is following the reasonable and prudent parent standard; and

(ii) the child has regular, ongoing opportunities to engage in age-appropriate or developmentally appropriate activities. The county agency shall consult with the child regarding opportunities to engage in such activities.

**(f.1) Additional determination.--**Based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following:

\*\*\*

(5) If and when the child will be placed in another planned permanent living arrangement[,] which is approved by the court, the following shall apply:

(i) The child must be 16 years of age or older.

(ii) The county agency shall identify at least one significant connection with a supportive adult willing to be involved in the child's life as the child transitions to adulthood, or document that efforts have been made to identify a supportive adult.

(iii) The county agency shall document:

(A) A compelling reason that it would not be best suited to the safety, protection and physical, mental and moral welfare of the child to be returned to the child's parent, guardian or custodian, to be placed for adoption, to be placed with a legal custodian or to be placed with a fit and willing relative.

(B) Its intensive, ongoing and, as of the date of the hearing, unsuccessful efforts to return the child to the child's parent, guardian or custodian or to be placed for adoption, to be placed with a legal custodian or to be placed with a fit and willing relative.

(C) Its efforts to utilize search technology to find biological family members for the child.

(iv) The court shall:

(A) Ask the child about the desired permanency goal for the child.

(B) Make a judicial determination explaining why, as of the date of the hearing, another planned permanent living arrangement is the best permanency plan for the child.

(C) Provide compelling reasons why it continues not to be in the best interests of the child to return to the child's parent, guardian or custodian, be placed for adoption, be placed with a legal custodian or be placed with a fit and willing relative.

(D) Make findings that the significant connection is identified in the permanency plan or that efforts have been made to identify a supportive adult, if no one is currently identified.

42 Pa.C.S. §§(f)-(f.1).

Furthermore, in a goal change proceeding, the "statutory mandates clearly place the trial court's focus on the best interest of the child." *In re S.B.*, 943 A.2d 973, 978 (Pa. Super. 2008). "Safety, permanency, and well-being of the child must take precedence over all other considerations." *Id*. (citation and emphasis omitted).

In the case at bar, the trial court stated on the record its specific reasons for concluding that a goal change to APPLA was in Child's best interest.

I'm going to grant [DHS's] request to change the goal to APPLA for this child. I've been involved in this family's life for a significant period of time, and watched the effect of [M]other's visits and interference with [] [C]hild's treatment at various institutions, causing [a] degrade in [] [C]hild's behavior and degrading [] [C]hild's accomplishments.

- 11 -

Mother continued to present a crusade against the people that were trying to help this [C]hild, and it came to a point where I had to reduce [] [M]other's contact with [] [C]hild and limit [] [M]other's contact with the agencies having a number of hearings over the course of the years that I presided over this case.

I directed Woods [] to do a video[,] *A Day in the Life of B.D.*, because I needed to have . . . more than words to describe [Child's] behavior and his limitations. And it presented a very real physical picture of [] [C]hild and [his] limitations and it re[-]affirmed my understanding that [] [C]hild had very little comprehension skills. He was functioning at a very elementary level. He has grown to be a fairly large boy. Now he [is] a young man, and at times it presented a challenge to the male staff, who his staff were primarily male, in terms of those who were supervising his conduct and behavior. And I believe that was because he was a physical challenge and not to disrespect the feminine staff, but they had different skills and were able to apply different skills to [Child], but there were periods of time when he needed to be restrained. I think the number of restraints diminished significantly after I curtailed [M]other's visits with him, and allowed the staff to treat him without [the] disruption that [] [M]other presented to them and to [] [C]hild.

While I recognize there is a biological relationship, [Child] does not have the capacity to understand the concept of [a] mother. We [have] seen adequate testimony that he responds to very visible, hands-on treatment and commands[, which] he needs [] on a daily, [] continual basis. He can be impulsive, although I understand that the staff now having had some time with him, understand his impulses and his ability to be impulsive.

If my memory serves me, he had violent encounters with other children in the institution . . . but my memory was that he needed to have that hands-on contact through staff. And [M]other walks in today expressing her love for the child, but she has no ability to care for [him], never will have.

[Child] will remain functioning at this level for the rest of his life, and if we [are] going to provide him with any meaningful life he has to have this kind of 24/7 around-the–clock protection. I saw [Child's] day when he was awoken. He had to be assisted with all of his clothing. He [needed assistance to change] his underwear. He [needed assistance] in almost every level of functioning, and the staff at Woods did their job admirably. They kept him calm.

- 12 -

They kept him on track to the level that he could focus on anything they kept him focused. They moved him about, moved him into the school bus, from the school bus into his class, then repeated the same procedure back again and got him ready for bed. [Child] needs no less than full institutional support.

Although [Mother] is well-intentioned[,] she does not have the ability nor will ever gain the ability. And the idea that she would say - when he comes home I'm going to get everything together and take care of [him] suggests a failure of [Mother's] ability to really understand what [Child] needs. [Mother] has presented no evidence that she could competently care for this child at the level that he needs to be cared for.

So[,] I'm going to grant your petition to change the goal to APPLA. He is an adult.

N.T. Permanency Hearing, 6/5/19, at 45-49. Upon review, we conclude that the record supports the trial court's conclusion that a goal change to APPLA is in the Child's best interest. As such, we discern no error of law or abuse of discretion.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/15/20

- 13 -