J-S82004-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: C.B., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: S.K., RESPONDENT MOTHER | |
| | No. 1140 MDA 2016 |

Appeal from the Order June 7, 2016
In the Court of Common Pleas of Lancaster County
Juvenile Division at No(s): CP-36-DP-0000018-2015
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| IN THE INTEREST OF: G.B., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: S.K., RESPONDENT MOTHER | |
| | No. 1141 MDA 2016 |

Appeal from the Order June 7, 2016
In the Court of Common Pleas of Lancaster County
Juvenile Division at No(s): CP-36-DP-0000019-2015

BEFORE: OTT, J., DUBOW, J., and PLATT, J.[*]

MEMORANDUM BY OTT, J.:                    **FILED DECEMBER 15, 2016**

---

[*] Retired Senior Judge assigned to the Superior Court.

S.K. ("Mother") appeals from the June 7, 2016 orders in the Court of Common Pleas of Lancaster County that changed the permanency goals for her sons, C.B.[1] and G.B.[2] (collectively, "the Children"), from reunification to placement with a permanent legal custodian with concurrent goals of adoption. Upon careful review, we affirm.[3]

The trial court set forth the following facts and procedural history, which the record evidence supports.

> The Agency [Lancaster County Children and Youth Services] has a lengthy history with the family dating back to 2001 concerning physical mistreatment of a child, parenting, housing, and income. The children were in foster care from October 2004 to November 2005. The Agency began to provide family support services on March 22, 2013, due to reported concerns for homelessness, [the Children's school] truancy, and Mother's mental health. On July 23, 2014, Mother had emergency open-heart surgery. She also has had significant issues involving her diabetes.
>
> On December 2, 2014, [C.B.'s] and [G.B.'s] school developed a truancy elimination plan for both the boys, as [G.B.] had missed twenty-eight days, and [C.B.] had missed twenty-nine days. On December 19, 2014, a family group conference was held, and family based services were initiated due to Mother's healthcare problems, truancy, and the children's care. On December 27, 2014, the Lancaster City Bureau of Police informed the Agency that [G.B.] and [C.B.] had reportedly broken into a church to

_____

[1] C.B. was born in July of 2004.

[2] G.B. was born in July of 2002.

[3] The Children's father, G.A.B. ("Father"), is deceased. The date of death is not included in the certified record before this Court.

steal food. The Agency verified the family's lack of food, and provided the family with a food order.

On January 16, 2015, another family group conference determined that [M]other was not following through with the plan developed at the first family group conference. These concerns, along with [the] fact that [B.E.][4] was handling many of the parental responsibilities for herself and her two brothers, led to the children's placement into the Agency's custody on January 28, 2015.

Trial Court Opinion, 7/28/16, at 2-3.

The Children were adjudicated dependent on April 16, 2015. The Agency established a Family Service Plan ("FSP") requiring Mother to improve her mental and physical health; to acquire good parenting skills; to obtain appropriate housing; and to attend supervised visitation with the Children one hour per week.

Permanency review hearings occurred at regular intervals. By the second permanency review hearing, on August 6, 2015, the trial court found that Mother had made substantial progress toward alleviating the circumstances that necessitated the Children's placement. The court directed that the Children "were permitted to transition home if a personalized parent trainer ("PPT") was assigned and it was verified that no other people were residing in Mother's home." Trial Court Opinion, 7/28/16, at 2. However, the transition never occurred. The court explained, in part:

_____

[4] B.E. is Mother's then seventeen-year-old daughter, and the half-sister of the Children. The Agency requested a goal change to adoption for B.E., which B.E. desired. By order entered on June 7, 2016, the court changed B.E.'s goal, and Mother did not file a notice of appeal.

On August 14, 2015, the Agency visited the residence and found non-family members present. On August 19, 2015, Mother admitted that the non-family members were residing with her. Mother continued to live in this residence . . . until November 3, 2015, when she began staying in a succession of motels and homeless shelters.

*Id.* at 3-4.

At the next permanency review hearing on January 8, 2016, the court found that Mother had made moderate progress toward alleviating the circumstances that necessitated the Children's placement. The court found, in part, that Mother still needed housing and parenting classes.

In April of 2016, the Agency filed a petition requesting that the court schedule the fifteen-month permanency review hearing, and requested orders changing the goal to placement with a permanent legal custodian with a concurrent goal of adoption. At that time, G.B. and his older half-sister, B.E., resided in the same foster home, and C.B. resided in a different foster home. A hearing occurred on June 2, 2016. The Agency presented the testimony of its caseworker, Jacqueline McNelis. The Guardian Ad Litem ("GAL") presented the testimony of B.E. Mother testified on her own behalf.

By orders dated June 2, 2016, and entered on June 7, 2016, the court found that Mother had made moderate progress toward alleviating the circumstances that necessitated the Children's placement. However, the court changed the Children's permanency goals. In addition, the court directed that Mother's supervised visits occur biweekly for one hour. Mother timely filed notices of appeal and concise statements of errors complained of

on appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925(a)(2)(i) and (b), which this Court consolidated *sua sponte*. The trial court filed its Rule 1925(a) opinion on July 28, 2016.

On appeal, Mother presents the following issues for our review:

A. Whether the [c]ourt[']s decision to change the goal for the [C]hildren was supported by the evidence[?]

B. Whether the [c]ourt[']s decision to change the goal was in the best interests of the [C]hildren[?]

Mother's brief at 10.

It is well-established that "goal change decisions are subject to an abuse of discretion standard of review." ***In re R.M.G.***, 997 A.2d 339, 345 (Pa. Super. 2010) (citation omitted).

> In order to conclude that the trial court abused its discretion, we must determine that the court's judgment was "manifestly unreasonable," that the court did not apply the law, or that the court's action was "a result of partiality, prejudice, bias or ill will," as shown by the record. We are bound by the trial court's findings of fact that have support in the record. The trial court, not the appellate court, is charged with the responsibilities of evaluating credibility of the witness and resolving any conflicts in the testimony. In carrying out these responsibilities, the trial court is free to believe all, part, or none of the evidence. When the trial court's findings are supported by competent evidence of record, we will affirm, "even if the record could also support an opposite result."

***Id.*** (citations omitted).

At permanency review hearings for dependent children removed from the parental home, a trial court must consider the factors set forth in the Juvenile Act, 42 Pa.C.S.A. § 6301 *et seq.*, as follows:

**(f) Matters to be determined at permanency hearing.—**

At each permanency hearing, a court shall determine all of the following:

(1) The continuing necessity for and appropriateness of the placement.

(2) The appropriateness, feasibility and extent of compliance with the permanency plan developed for the child.

(3) The extent of progress made toward alleviating the circumstances which necessitated the original placement.

(4) The appropriateness and feasibility of the current placement goal for the child.

(5) The likely date by which the placement goal for the child might be achieved.

(5.1) Whether reasonable efforts were made to finalize the permanency plan in effect.

(6)  Whether the child is safe.

. . .

(9) If the child has been in placement for at least 15 of the last 22 months or the court has determined that aggravated circumstances exist and that reasonable efforts to prevent or eliminate the need to remove the child from the child's parent, guardian or custodian or to preserve and reunify the family need not be made or continue to be made, whether the county agency has filed or sought to join a petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child unless:

(i) the child is being cared for by a relative best suited to the physical, mental and moral welfare of the child;

(ii) the county agency has documented a compelling reason for determining that filing a petition to terminate parental rights would not serve the needs and welfare of the child; or

(iii) the child's family has not been provided with necessary services to achieve the safe return to the child's parent, guardian or custodian within the time frames set forth in the permanency plan.

. . .

**(f.1)** *Additional determination.* — Based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following:

. . .

(3) If and when the child will be placed with a legal custodian in cases where the return to the child's parent, guardian or custodian or being placed for adoption is not best suited to the safety, protection and physical, mental and moral welfare of the child.

. . .

42 Pa.C.S.A. § 6351(f)(1)-(6), (9); (f.1)(3).

We have stated that, "[t]hese statutory mandates clearly place the trial court's focus on the best interests of the child." *In re S.B.*, 943 A.2d 973, 978 (Pa. Super. 2008) (citation omitted). "Safety, permanency, and well-being of the child must take precedence over **all** other considerations." *Id.* (citation omitted) (emphasis in original). Moreover, "the burden is on

the child welfare agency . . . to prove that a change in goal would be in the child's best interest." **In re R.I.S.**, 36 A.3d 567, 573 (Pa. 2011).

Further, this Court has explained:

The agency is not required to offer services indefinitely, where a parent is unable to properly apply the instruction provided. **In re A.L.D.,** 797 A.2d 326, 340 (Pa. Super. 2002). **See also In re S.B., supra** at 981 (giving priority to child's safety and stability, despite parent's substantial compliance with permanency plan); **In re A.P.,** 728 A.2d 375, 379, (Pa. Super. 1999), *appeal denied,* 560 Pa. 693, 743 A.2d 912 (1999) (holding where, despite willingness, parent cannot meet "irreducible minimum parental responsibilities, the needs of the child must prevail over the rights of the parent"). Thus, even where the parent makes earnest efforts, the "court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." **In re Adoption of R.J.S.,** 901 A.2d 502, 513 (Pa. Super. 2006).

**In re R.M.G.**, 997 A.2d at 347.

Instantly, the trial court determined that, "[a]fter more than fifteen months, Mother has not demonstrated the requisite responsibility to appropriately parent the children." Trial Court Opinion, 7/28/16, at 7. In addition, the court explained its decision to change the goal to placement with a permanent legal custodian for the following reason:

Adoption is not an appropriate goal for [G.B.] and [C.B.] at this time. There have been conflicting reports about the desires of the two boys. They both have a relationship with their mother, and their visits with her go well, though [C.B.] and [G.B.] primarily interact with each other while Mother and [B.E.] talk. They are both twelve years of age or older, and as per 23 Pa.C.S.A. § 2711(a)(1), their consent would be necessary for adoption. Neither of the boys has expressed a desire or willingness to be adopted. . . .

- 8 -

*Id.* Upon review, the testimonial evidence supports the court's findings.

On appeal, Mother argues that it was not in the Children's best interests for the goal to be changed.[5] Specifically, Mother asserts that the Children "have not done well in placement, have run away, and only seem happy during visitation with their mother." Mother's brief at 15. Mother also asserts that the trial court placed too much weight on the testimony of her daughter, B.E. We disagree.

Contrary to Mother's assertions, the trial court found with respect to the Children:

> [G.B.] struggles in school, but is receiving learning support services in core subjects. He needs to improve his anger management. He has been in therapy since 2015, but has been unwilling to open up to his therapist. Nevertheless, [G.B.] is typically happy in the resource home. Visits with Mother go well, but they cause him to be moody for the rest of the day as [Mother] does not spend much time directly interacting with him.
>
> [C.B.] is doing well in his current placement, and is connecting with the resource family. He attends a life skills class, and he was successfully discharged from Art Therapy in October 2015. . . .
>
> [C.B.'s] and [G.B.'s] relationship with their Mother is limited due to her actions that led to their placement and is evidenced by the way Mother interacts with them at visits. The boys have expressed uncertainty about returning to Mother's care. At their

---

[5] In her brief, Mother neither divides the argument into separate parts nor distinctively displays her claims. *See* Pa.R.A.P. 2119 (providing "[t]he argument shall be divided into as many parts as there are questions to be argued; and shall have at the head of each part -- in distinctive type or in type of distinctively displayed -- the particular point treated therein, followed by such discussion and citation of the parties as are deemed pertinent").

weekly visits with Mother, [C.B.] and [G.B.] play with each other while Mother primarily talks with [B.E.]. . . .

Trial Court Opinion, 7/28/16, at 8-9 (citations to record omitted). Upon review, the testimony of Jacqueline McNelis, the Agency caseworker, and B.E. support the court's findings.

Further, there is no testimonial evidence that C.B. has ever run away from his foster home. With respect to G.B., Ms. McNelis testified on cross-examination by Mother's counsel as follows:

Q. [W]as there testimony that . . . one of the two boys just sort of disappeared for a few hours [from the foster home] and –

A. It's my understanding that . . . [G.B.] will leave without letting the resource parents know and he's gone for an hour or two at a time and doesn't keep the resource parents updated about where he's going or what he's doing.

Q. Does this happen frequently?

A. It's my understanding it's [sic] happened just a few time[s]. I don't believe it happens all the time.

N.T., 6/2/16, at 29.

With respect to Mother's assertion that the court improperly weighed B.E.'s testimony, we disagree. B.E. testified as follows regarding taking care of Mother and the Children from the age of seven.

I gave up my whole life for her, ever since I was seven. I don't want my brothers to do that because, like I said, my GPA sucks, and I know I could've done a whole lot better, but I wasn't . . . able to go to school because I had to take care of my mom and my brothers. . . . I don't want that life for my brothers. They deserve more. They deserve to go to school and not have to worry about things at the ages they are right now.

*Id.* at 39. B.E. testified that, if the Children return home:

> [G.B.] is just gonna run the streets. He's gonna get into trouble. So is [C.B.]. [C.B.]'s going to follow along and they're not going to go to school, because they'll wake up and they'll say they don't want to go to school, and I know this because they did that when we were home. They'll get up and say, we don't feel like going to school today, and they'll make up some kind of lie about not wanting to go to school, and [Mother will] fall right into it and believe it.

*Id.* at 50.

In addition, B.E. testified that, in her opinion, Mother wants the Children's death benefits, which the record reveals the Children receive due to Father's death.[6] *Id.* at 10. B.E. testified that Mother will "have more money to spend because she'll receive those death benefits back because of the boys, and I know this because every time I'm with her, she always brings it up about the money. [ ] So that's all she wants out of us is money and someone to take care of her." *Id.* at 50-51. To the extent that the trial court based the subject orders, in part, on the foregoing testimony of B.E., we discern no abuse of discretion. *See In re R.M.G.*, 997 A.2d at 345 (stating that "[t]he trial court, not the appellate court, is charged with the responsibilities of evaluating credibility of the witness and resolving any

---

[6] It is important to note that B.E.'s father is also deceased, and she receives Social Security death benefits as a result. N.T., 6/2/16, at 9-10. Moreover, Ms. McNelis agreed on direct examination that, prior to the placement of B.E. and the Children, Mother's household received more than $2,000 in income per month. *Id.* at 10.

conflicts in the testimony. In carrying out these responsibilities, the trial court is free to believe all, part, or none of the evidence.").

Importantly, the trial court changed the Children's permanency goals, in part, based on the following findings, which Mother's testimony supports:

> Mother blames the Agency's involvement during the last fifteen months for making her life worse, essentially denying any responsibility. During the same period[,] she failed to stay in regular contact with her caseworker. When asked about the children's truancy, Mother alternatively blamed her daughter and the caseworker. According to Mother, [B.E.] was not going to school because she was lying to Mother about being bullied. Mother then blamed the caseworker for not making the child attend school.

Trial Court Opinion, 7/28/16, at 6-7 (citations to record omitted).

Further, the trial court concluded that:

> [C.B.] and [G.B.] are currently receiving the oversight and support that they need. Permanent legal custodianship provides them with necessary support while allowing them to maintain their relationship with their Mother. At the June 2, 2016, hearing, the children's [GAL] echoed [B.E.]'s testimony, and opined that permanent legal custodianship was in the best interest of [C.B.] and [G.B.].[7] Mother's conduct over the last fifteen months, and her testimony at the hearing, clearly show that she is not a permanent resource for the boys at this time.

*Id.* at 9. We discern no abuse of discretion. As such, Mother's argument that a change of goal was not in the Children's best interests is without merit.

---

[7] The GAL filed a brief in this appeal in support of the Children's goal change orders.

In addition, Mother asserts that the Agency "stopped working [to reunify her with the Children] before being permitted to do so by the [c]ourt" by "directing her to a one-bedroom instead of a two[-]bedroom" apartment. Mother's brief at 17. Further, Mother asserts that the Agency failed to renew the referral for a personalized parent trainer so that she could have had parent training in her home for two months before the subject proceedings. *Id.* at 16. To the extent Mother asserts that the court abused its discretion in changing the Children's permanency goals due to the Agency's alleged failures in this regard, we disagree.

The trial court aptly found that Ms. McNelis "explained that she advised Mother to start with a smaller apartment to help her avoid homelessness, and to allow her to make progress on her goals." Trial Court Opinion, 7/28/16, at 6 (citation to record omitted). Ms. McNelis testified that Mother moved into a one-bedroom apartment on April 19, 2016. N.T., 6/2/16, at 6-7. She described the apartment as having "a small living room, and the bedroom is right off of the living room, and there's a kitchen and a bathroom." *Id.* at 8. Further, she described the apartment as being "all open, so [Mother's] bedroom is off of the living room, but there's no door for privacy. [E]verything is [just] open." *Id.* at 28. Ms. McNelis testified as follows with respect to her review of the lease agreement:

> Q. Any indication on the lease as to how many individuals can live in this one-bedroom apartment?
>
> A. I believe just one person can live there.

- 13 -

*Id.* at 7. Ms. McNelis further testified that she does not know if it would be appropriate for the Children to share the one bedroom and for Mother to sleep on the couch. *Id.* at 28. She testified on cross-examination by Mother's counsel, in part, "I guess it could be looked into." *Id.* at 29.

As discussed *supra*, the testimonial evidence overwhelmingly demonstrates that, independent of her housing situation and the size of her apartment, Mother "has not demonstrated the requisite responsibility to appropriately parent" the Children, and the subject orders serve their best interests. Trial Court Opinion, 7/28/16, at 7. Therefore, we will not disturb the orders. Mother's issues fail. Accordingly, we affirm the goal change orders.

Orders affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/15/2016