J-S55017-20

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| IN THE INTEREST OF: J.G. JR., J.G., M.G. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: J.G. SR., FATHER | : | No. 715 WDA 2020 |

Appeal from the Order Dated June 19, 2020
In the Court of Common Pleas of Cambria County Criminal Division at
No(s): CP-11-DP-0000120-2015,
CP-11-DP-0000130-2018, CP-11-DP-0000131-2018

BEFORE: BOWES, J., McCAFFERY, J., and COLINS, J.[*]

MEMORANDUM BY McCAFFERY, J.: FILED FEBRUARY 12, 2021

J.G., Sr. (Father), appeals from the June 19, 2020, dependency orders, entered in the Cambria County Court of Common Pleas, regarding his three sons, J.G., Jr., born in April of 2010, J.G., born in November of 2011, and M.G., born in April of 2014 (collectively, the Children). The orders changed the Children's permanency goals from reunification to adoption.[1] Father argues the trial court erred in finding the Children are dependent and in changing the goals to adoption. After careful review, we affirm.

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] The Children's mother, T.G. (Mother), did not appeal from the subject orders.

## I. Facts & Procedural History

We summarize the relevant facts and procedural history as follows. M.G., the youngest child, suffers from a "genetic abnormality," and his medical treatment involved "a specific feeding regiment," which included four cans of PediaSure per day. Trial Ct. Op., 8/12/20, at 2. The Cambria County Children and Youth Services (the Agency) learned M.G. was receiving only one can per day. Id. As a result, the "Agency advised Father to take M.G. to the emergency room[,] but [he] refused." Id. at 9. The Agency was "concerned with Father's failure to follow through with M.G.'s medical care," and on April 20, 2018, the trial court placed then-four-year-old M.G. in the emergency custody of the Agency.[2] Three days later, on April 23, 2018, following a shelter care hearing, the trial court placed M.G. in shelter care. Id.

On May 4, 2018, following an evidentiary hearing, the court adjudicated M.G. dependent and placed him in the legal and physical custody of the Agency. Trial Ct. Op. at 2. The court established reunification as M.G.'s placement goal. Order of Adjudication & Disposition, 5/4/18, at 2. Father was required to satisfy the following permanency plan objectives, in part:

_____

[2] M.G. was previously adjudicated dependent in October of 2015, and the court placed him in the legal and physical custody of the Agency. The court terminated M.G.'s dependency two years later, in October of 2017. Thus, M.G. was in the legal and physical custody of Father and Mother for approximately seven months before the court adjudicated him dependent again. N.T. at 60–61.

participate in a psychological evaluation; attend M.G.'s medical appointments; maintain a clean, safe, and adequately furnished home; cooperate with all Agency-scheduled home and office visits; and allow the Agency to inspect his home. Trial Ct. Op. at 2. Thereafter, the court held permanency review hearings for M.G. at regular intervals. Id. at 3.

On October 19, 2018, the trial court placed the older children, J.G., Jr., and J.G., in the emergency custody of the Agency, due to the Agency's receipt of a report from the older children's school alleging Mother had physically abused them. Trial Ct. Op. at 3. The report alleged that during the physical abuse, "Father was outside, aware of [the] abuse, [but] did not intervene." Id. The report further alleged that J.G., Jr., and J.G. were treated at the hospital for injuries sustained from Mother's abuse, including abrasions, bruises, and scratches. Id. In addition, the report alleged that J.G., Jr., and J.G. were "monitored for 24 hours for symptoms of a concussion." Id.

Following a shelter care hearing on October 22, 2018, the trial court placed J.G., Jr., and J.G. in shelter care. Trial Ct. Op. at 4. On October 31st, following an evidentiary hearing, the court adjudicated J.G., Jr., and J.G. dependent and placed them in the legal and physical custody of the Agency.[3] Id. The court likewise established reunification as the permanency goals for

_____

[3] At the time of the underlying goal change proceeding, M.G. and J.G. resided in the same foster care home. N.T. at 53. J.G., Jr., was in a separate foster placement.

J.G., Jr., and J.G. The court set forth the same permanency objectives for Father as in M.G.'s dependency case, and the court held permanency review hearings at regular intervals. Id.

On June 9, 2020, the Agency filed three separate goal change petitions for each child. The trial court conducted a hearing on June 16th. The Agency presented: (1) the testimony of its caseworkers, Ashley Shaffer and Carol Crouse; (2) the testimony of and a June 12, 2020, written report by Jeffrey Grove, a family advocate at the Bair Foundation; (3) the testimony of and written evaluation by Dennis M. Kashurba, a licensed psychologist who performed evaluations of both Father and Mother; (4) the testimony of and written summary by Kathy Scaife, the Independent Families Services (IFS) caseworker, who worked with Father regarding budgeting issues; and (5) the testimony of Dr. John Jubas, the court-appointed educational decision-maker for the Children. At this juncture we note Dr. Kashurba testified Father "has barely adequate intellectual ability to function in a primary parent role for the two older boys[, even] if he has continued intensive services of the sort that are currently in place."[4] N.T., 6/16/20, at 38. Father testified on his own behalf.

_____

[4] Dr. Kashurba also testified that Mother "function[s] within a mild level of intellectual disability[, and] appears to have ongoing mental health issues." N.T. at 35.

At the conclusion of the permanency hearing, the trial court granted the Agency's petitions to change the Children's permanency goals to adoption. N.T. at 77. In addition, the court suspended the Children's visits with Father and Mother. Id. Finally, the court ordered the Agency to place the Children in trauma therapy, and "to explore different adoptive families for the different children to whatever will suit the best needs of each child individually." Id. at 77, 79.

On June 19, 2020, the trial court issued the three underlying permanency review orders, changing each of the Children's permanency goals to adoption.[5] The orders suspended all visitation between Father, Mother, and the Children. Finally, the orders directed the Agency to enroll the Children in trauma therapy and to identify separate adoptive resources for them.

On July 8, 2020, Father timely filed a counseled single notice of appeal from the permanency orders, wherein he listed all of the Children's trial court docket numbers. The following day, Father filed a single concise statement of

_____

[5] The text of the orders state the issuance date is June 17, 2020; however, the orders are stamped filed as of June 19th. Furthermore, we note the trial court issued an amended permanency review order dated June 29, 2020, with respect to J.G. only. Upon review, it appears to be identical to the original June 19th order.

errors complained of on appeal, wherein he also listed all of the Children's trial court docket numbers.[6]

## II. Walker Issue

On September 16, 2020, this Court directed Father to show cause why his appeal should not be quashed pursuant to Commonwealth v. Walker, 185 A.3d 969 (Pa. 2018), wherein our Supreme Court held Pa.R.A.P. 341(a)[7] requires an appellant to file separate notices of appeal "when a single order resolves issues arising on more than one lower court docket, [and the] failure to do so will result in quashal of the appeal." See id. at 977. Father responded in part:

> 4. Even though the [C]hildren involved all have independent dockets numbers, the case(s) were heard by the trial court at one time, collectively and not independently of one another.
>
> 5. The evidence presented against Father was admitted and heard by the trial Court simultaneously for the purpose of all three [C]hildren and docket numbers.

_____

[6] In a children's fast track appeal, "the concise statement of errors complained of on appeal shall be filed and served with the notice of appeal." Pa.R.A.P. 1925(a)(2)(i). Because no party claims prejudice as a result of Father's procedural violation, we will not quash or dismiss his appeal on this basis. See In re K.T.E.L., 983 A.2d 745, 748 (Pa. Super. 2009) (declining to find waiver where mother filed Rule 1925(a)(2) statement three days after notice of appeal, where other parties were not prejudiced).

[7] Rule 341(a) provides that generally, "an appeal may be taken as of right from any final order of a . . . trial court." Pa.R.A.P. 341(a).

Father's Response, 9/25/20, at ¶¶ 4–5. By order dated October 28, 2020, this Court discharged the show cause order, but advised the parties that merits panel may revisit the issue of the propriety of this appeal.

This Court has explained:

> In [Walker], our Supreme Court disapproved of the common practice of filing a single notice of appeal from an order or judgment involving more than one docket number. . . .
>
> *   *   *
>
> However, there are exceptions to the bright-line rule set forth in Walker. This Court has declined to quash a defective notice of appeal when the defect resulted from an appellant's acting in accordance with misinformation from the trial court, deeming the situation a breakdown in court operations. See Commonwealth v. Larkin, [235 A.3d 350] (Pa. Super. 2020) (en banc)[.] In Larkin, an appellant filed a pro se notice of appeal seeking relief relating to more than one docket after the order informing appellant of his appellate rights provided "Petitioner has [30] days from the date of this order to file an appeal." [Larkin, 235 A.3d at 354] (emphasis in original). An en banc panel of this Court held that this Court may "overlook the requirements of Walker where . . . a breakdown occurs in the court system, and a defendant is misinformed or misled regarding his appellate rights." Id. . . .

In the Int. of K.M.W., 238 A.3d 465, 469 (Pa. Super. 2020) (en banc).

In K.M.W., the mother filed a single notice of appeal from a decree that involuntarily terminated her parental rights at one docket and changed the child's permanency goal to adoption at another docket. K.M.W., 238 A.3d 468-69. This Court declined to quash the appeal, reasoning, in part, that "[t]he trial court's indication that [she] could seek relief from this Court

by filing a singular appeal from multiple lower court docket numbers constitutes a breakdown in court operations." Id. at 470 (emphasis added).

In the case sub judice, we note that each of the three Children's dependency cases has a separate trial docket number, and the Agency filed separate petitions for goal change — one at each Child's docket. The trial court did not issue one single order disposing of all three dockets. Instead, the court issued three separate orders, each pertaining to one child's case only. Accordingly, we acknowledge Walker is not squarely implicated. See Walker, 185 A.3d at 971 ("[W]here a single order resolves issues arising on more than one docket, separate notices of appeal must be filed for each case.") (emphasis added). Nevertheless, to the extent Father wishes to challenge all three Children's goal changes, it is clear he was required to file a separate notice of appeal from each order. See Pa.R.A.P. 902 ("An appeal permitted by law as of right from a lower court to an appellate court shall be taken by filing a notice of appeal with the clerk of the lower court within the time allowed by Rule 903 (time for appeal).").

After review of the certified record, we emphasize the following irregularities. Although each child's case has a separate trial docket number, the three records are bound together in a single volume. Appearing first in the record are the separate trial court dockets for each child. The next portion of the record consists of pleadings and orders relating to M.G. only, through the Agency's September 27, 2018, motion for a permanency hearing.

The next portion of the record, however, begins with the Agency's October 23, 2018, shelter care application filed with respect to J.G., Jr., followed by the shelter care application filed on the same date with respect to J.G. The record then includes a single order dated October 23, 2018, removing both J.G., Jr., and J.G. from Father and Mother's custody pending the shelter care hearing. Likewise, the record includes a single order dated October 31, 2018, appointing Dr. John A. Jubas as the educational decision-maker for J.G., Jr., and J.G. Otherwise, separate pleadings and orders pertaining to J.G., Jr., and J.G. are filed, but they appear interspersed in chronological order. Put another way, this part of the record includes a filing for J.G., Jr., then immediately thereafter the same type of filing for J.G. Next, beginning with the Agency's February 14, 2019, motion for a permanency hearing, the record is organized chronologically with the separate pleadings and orders for all three Children. The only exception is the trial court's April 1, 2019, single order appointing a child advocate, which lists all three Children's docket numbers.

We summarize the above in detail to provide context for Father's single notice of appeal, which lists all three docket numbers. Although he filed a single notice of appeal — as well as a single Rule 1925(a)(2) statement — the court entered them as filed at all three Children's dockets. On review, this panel attempted to determine whether the notice of appeal was filed at a particular docket, so as to conclude the appeal at that docket at least was

proper. However, due to the state of the record — the intermingling of all three Children's filings and orders — we could not do so.

We thus conclude, on the particular record before us, that a breakdown in court operations occurred where: the three Children's certified records are intermingled and bound together as one volume; the trial court has issued several single orders that pertained to more than one docket number; and we are unable to discern at which docket the notice of appeal was filed. Furthermore, we note the trial court provided no instruction to Father, after announcing its ruling, that he could seek appellate relief.[8] We thus decline to quash Father's appeals for any violation of our Rules of Appellate Procedure. We now turn to the merits of Father's appeal.

### III. Father's Challenges to Goal Change Orders

Father raises the following issue for our review:

Whether the Court abused its discretion or committed an error of law when it granted the Petition for Dependency and ordered the permanency goal of adoption, without further attempting reunification under the Adoption and Safe Families Act 42 U.S.C. 671 et seq.

Father's Brief at 4.[9]

_____

[8] The trial court made no mention of any appeal or appeals. See N.T. at 79-80.

[9] While Father raises only one issue in his statement of the questions involved, his argument is divided, with headings, into two distinctive parts, contrary to Pa.R.A.P. 2119(a) ("The argument shall be divided into as many parts as there are questions to be argued; and shall have at the head of each part — in

- 10 -

First, Father argues the trial court erred in: (1) finding the Agency established the Children met the definition of dependency under Section 6302 of the Juvenile Act,[10] 42 Pa.C.S. § 6302; and (2) granting the Agency's petition for dependency. Father's Brief at 4-7. As discussed above, however, the court previously adjudicated M.G. dependent on April 24, 2018, and J.G., Jr., and J.G. on October 23, 2018. Those prior orders are not the subject of this appeal. Instead, this appeal is taken from the June 19, 2020, orders changing the Children's goals from reunification to adoption. Accordingly, no relief is due on Father's challenge to the adjudications of dependency. To the extent Father challenges the fact that the instant order "maintain[s] the [C]hildren's dependency," we address that argument in his remaining claims below. See id. at 7.

Next, Father relies on the following provisions of the federal Adoption and Safe Families Act (ASFA):

§ 671. State plan for foster care and adoption assistance

(a) Requisite features of State plan. In order for a State to be eligible for payments under [42 USCS §§ 670 et seq.], it shall have a plan approved by the Secretary which —

\* \* \*

_____

distinctive type or in type of distinctively displayed — the particular point treated therein, followed by such discussion and citation of the parties as are deemed pertinent.").

[10] 42 Pa.C.S. §§ 6301-6375.

(15) provides that —

    (A) in determining reasonable efforts to be made with respect to a child, as described in this paragraph, and in making such reasonable efforts, the child's health and safety shall be the paramount concern;

    (B) except as provided in subparagraph (D), reasonable efforts shall be made to preserve and reunify families —

        (i) prior to the placement of a child in foster care, to prevent or eliminate the need for removing the child from the child's home; and

        (ii) to make it possible for a child to safely return to the child's home;

           *    *    *

    (D) reasonable efforts of the type described in subparagraph (B) shall not be required to be made with respect to a parent of a child if a court of competent jurisdiction has determined that —

        (i) the parent has subjected the child to aggravated circumstances (as defined in State law, which definition may include but need not be limited to abandonment, torture, chronic abuse, and sexual abuse)[.]

Father's Brief at 8-10, quoting 42 U.S.C. § 671(a)(15)(A), (B)(i)-(ii), (D)(i).

With respect to Section 671(a)(15)(A), Father asserts the trial court abused its discretion in changing the Children's goals without considering their health and safety. Father's Brief at 8. With respect to the "reasonable efforts" required by Section 671(a)(15)(B), Father argues the Agency made "little to no effort . . . to preserve and reunify" the Children with him. Id. at 9. Specifically, Father asserts the Agency's "information is stale, [as] they based their information on housing conditions prior to removal [in April and October

of 2018], psychological evaluations that took place over a year and a half prior to the goal change hearing, and his limited progress before December of 2019." Id. Further, he asserts, "visits due to Covid-19 pandemic were done via 'zoom' or video chat, which limited hands-on parenting skills and lessons." Id. Lastly, with respect to Section 671(a)(15)(D), Father asserts aggravated circumstances did not exist in this case, and thus the trial court "prematurely changed the goal to . . . adoption, by not first offering adequate services in an attempt at reunification." Id. at 10-11. After careful review, we conclude the testimonial and documentary evidence supports the trial court's goal change orders.

We review a goal change order for an abuse of discretion. In re R.M.G., 997 A.2d 339, 345 (Pa. Super. 2010).

> In order to conclude that the trial court abused its discretion, we must determine that the court's judgment was "manifestly unreasonable," that the court did not apply the law, or that the court's action was "a result of partiality, prejudice, bias or ill will," as shown by the record. We are bound by the trial court's findings of fact that have support in the record. The trial court, not the appellate court, is charged with the responsibilities of evaluating credibility of the witness and resolving any conflicts in the testimony. In carrying out these responsibilities, the trial court is free to believe all, part, or none of the evidence. When the trial court's findings are supported by competent evidence of record, we will affirm, "even if the record could also support an opposite result."

Id. (citation omitted).

With respect to Father's reliance on the federal AFSA, this Court has stated:

> [T]he Juvenile Act was amended in 1998 to conform to ASFA. Furthermore, the 1998 amendments to the Juvenile Act, as required by ASFA, place the focus of court proceedings on the child. Safety, permanency, and the well-being of the child must take precedence over all other considerations, including the rights of the parents.

See In re M.S., 980 A.2d 612, 615 (Pa. Super. 2009).

This Court has explained:

> Although a goal change to adoption is a step towards termination of parental rights, it does not in fact terminate parental rights. When the court allows [the agency] to change the goal to adoption, it has decided "[the agency] has provided adequate services to the parent but that he/she is nonetheless incapable of caring for the child and that, therefore, adoption is now the favored disposition." Once the goal is changed to adoption, [the agency] is not required to provide further services.

In re S.B., 943 A.2d 973, 978 (Pa. Super. 2008) (citations omitted).

Sections 6351(f) and (f.1) of the Juvenile Act provide, in relevant part:

> (f) Matters to be determined at permanency hearing. — At each permanency hearing, a court shall determine all of the following:

> > (1) The continuing necessity for and appropriateness of the placement.

> > (2) The appropriateness, feasibility and extent of compliance with the permanency plan developed for the child.

> > (3) The extent of progress made toward alleviating the circumstances which necessitated the original placement.

> > (4) The appropriateness and feasibility of the current placement goal for the child.

> > (5) The likely date by which the placement goal for the child might be achieved.

(5.1) Whether reasonable efforts were made to finalize the permanency plan in effect.

(6) Whether the child is safe.

\* \* \*

(9) If the child has been in placement for at least 15 of the last 22 months or the court has determined that aggravated circumstances exist and that reasonable efforts to prevent or eliminate the need to remove the child from the child's parent, guardian or custodian or to preserve and reunify the family need not be made or continue to be made, whether the county agency has filed or sought to join a petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child unless:

(i) the child is being cared for by a relative best suited to the physical, mental and moral welfare of the child;

(ii) the county agency has documented a compelling reason for determining that filing a petition to terminate parental rights would not serve the needs and welfare of the child; or

(iii) the child's family has not been provided with necessary services to achieve the safe return to the child's parent, guardian or custodian within the time frames set forth in the permanency plan.

\* \* \*

(10) If a sibling of a child has been removed from his home and is in a different placement setting than the child, whether reasonable efforts have been made to place the child and the sibling of the child together or whether such joint placement is contrary to the safety or well-being of the child or sibling.

(11) If the child has a sibling, whether visitation of the child with that sibling is occurring no less than twice a month,

unless a finding is made that visitation is contrary to the safety or well-being of the child or sibling.

\*     \*     \*

(f.1) Additional determination. — Based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following:

\*     \*     \*

(2) If and when the child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

42 Pa.C.S. § 6351(f)(1)-(6), (9)-(11); (f.1)(2).

With respect to Section 6351(f), this Court has explained:

The trial court must focus on the child and determine the goal with reference to the child's best interests, not those of the parents. "Safety, permanency, and well-being of the child must take precedence over all other considerations." Further, at the review hearing for a dependent child who has been removed from the parental home, the court must consider the statutorily mandated factors. "These statutory mandates clearly place the trial court's focus on the best interests of the child."

In re S.B., 943 A.2d at 978 (citation omitted). Moreover, "the burden is on the child welfare agency . . . to prove that a change in goal would be in the child's best interest." In re R.I.S., 36 A.3d 567, 573 (Pa. 2011).

This Court recently reiterated:

[T]he policy underlying the Juvenile Act is to "prevent children from languishing indefinitely in foster care, with its inherent lack of permanency, normalcy, and long-term parental commitment." An agency is also not required to offer services indefinitely, where a parent is unable to properly apply the instruction provided.

However, an agency must redirect its efforts towards placing the child in an adoptive home only after "the child welfare agency has made reasonable efforts to return a foster child to his or her biological parent, but those efforts have failed[.]"

In Interest of T.M.W., 232 A.3d 937, 947 (Pa. Super. 2020) (citations omitted).

Finally, we note the following, in connection with Father's claim "that the lack of aggravated circumstances is significant."[11] See Father's Brief at 11 (emphasis added). Section 6341(c.1) of the Juvenile Act provides that if a trial court determines that a child is dependent, and aggravated circumstances have been alleged by the county agency or by the child's attorney, the court must also determine whether aggravated circumstances exist. 42 Pa.C.S. § 6341(c.1). If the court determines that aggravated circumstances exist, the court must then consider whether reasonable efforts should be made to reunify the child with their parent. Id.

_____

[11] Father relies on the dissenting opinion in M.S., 980 A.2d 612, which addresses the lack of a finding of aggravating circumstances in that case. See Father's Brief at 12. However, Father presents no argument why this Court should be bound by or otherwise apply a dissenting opinion. In any event, we note the issue in M.S. was whether the trial court erred in directing the initial permanency goal to be adoption, rather than reunification, due to existence, or not, of aggravated circumstances pursuant to 42 U.S.C. § 671(a)(15)(D)(i) and 42 Pa.C.S. § 6342(c.1) and 6302. M.S., 980 A.2d at 614. This Court held, on the facts before it, that "the initial permanency goal . . . need not be set at reunification." Id. at 615. In contrast, this appeal does not present that issue.

Instantly, the Agency did not allege any aggravated circumstances. Nevertheless, by the time of the underlying permanency review hearing in June of 2020, M.G. had been in placement for 26 months, and J.G., Jr., and J.G. for 20 months. Pursuant to Section 6351(f)(9), the trial court was to determine whether the Children have "been in placement for at least 15 of the last 22 months or . . . that aggravated circumstances exist." See 42 Pa.C.S. § 6351(f)(9) (emphasis added). Because the Juvenile Act conforms to the ASFA, we conclude Father's argument with respect to 42 U.S.C. § 671(a)(15)(D) is without merit.

In reviewing Father's challenge to the trial court's decision to change the Children's goals from reunification to adoption, we consider the testimonial evidence presented at the June 16, 2020, permanent review hearing. See also Trial Ct. Op. at 15–18 (summarizing same). First, with respect to Father's argument that the Agency failed to provide reasonable efforts to reunify the Children with him, Agency Caseworker Carol Crouse testified that reunification services were initiated in May of 2015. N.T. at 56. Caseworker Crouse prepared a list of 19 services provided to Father, Mother, and/or the Children, 17 of which were still in effect. Id. at 63. Caseworker Crouse testified that, despite five years of services, Father "has not gained any . . . parenting skills[,]" but both parents' "perception is that they have done everything that has been asked[, and] they have done it well." Id. at 59. She testified, "I professionally do not believe that [the Agency] has access to

any other services that would assist this family any more than the services that they have had." Id. at 57.

Agency Caseworker Ashley Shaffer testified she worked with Father and Mother for the past 25 months on parenting, decision-making, and understanding the medical needs of the Children. N.T. at 5–6. She testified as follows on direct examination:

> [Agency's counsel:] Quite simply, how has that been going?
>
> [Caseworker Shaffer:] It has been going very poor[ly]. There has been very minimal progress since I began services.
>
> Q. Can you explain to me what that means; very poor, very minimal progress?
>
> A. The parents have not been able to implement the parenting skills that I have been reviewing with them since May of 2018 during their visitation with their children. They still present very egocentric. They're more concerned about their own needs that their children's. They have not demonstrated any empathy towards their children and their needs. They just worry about themselves.
>
> Q. Give me an example of them not being empathetic towards [the Children].
>
> A. For instance, recently [J.G., Jr., had] surgery regarding an undescended testicle. They did not go to the doctor's appointment for the surgery, nor did they . . . even ask him how he was feeling or about the surgery [at subsequent visitation]. There was another occasion [J.G., Jr.,] had a doctor's appointment. They promised him they were going to go. He was looking for them. They never showed up. When he called them that evening they had friends over and said they would call him back. They never called him back[,] and he was very upset that evening not understanding why his parents didn't care about him.

Id. at 6–7. In addition, Caseworker Shaffer testified about Father's and Mother's "lack of protective capacity[:]" "To this day [Father] and [Mother] deny the physical abuse of [J.G.]. They call him a liar. They say that he made it up. [Father] has said in front of me to [Mother], if it takes everything I own, I will protect you. He called [J.G.] a liar and he continued to stand by his wife." Id. at 7.

On cross-examination by the Children's attorney, Caseworker Shaffer testified:

> [Children's counsel:] Is there anything you can think of that the Agency did not do or could have done better which would have resulted in a different determination [than changing the goal to adoption]?
>
> [Caseworker Shaffer:] No. It just appears that their limitations and mental health continued to be a barrier to their greater comprehension of the Agency's concerns, and it doesn't appear that they can understand what they need to change, and I don't believe that will change.

N.T. at 15.

Indeed, Dennis Kashurba, the licensed psychologist who evaluated Father, testified, to a reasonable degree of medical certainty, that Father "has barely adequate intellectual ability to function in a primary parent role . . . if he has continued intensive services of the sort that are currently in place." N.T. at 38, 40.

Further, Jeffrey Grove, a family advocate for the Bair Foundation, testified that, since November of 2018, he has facilitated visitation between Father, Mother, and the Children, and he works with Father and Mother on

- 20 -

their parenting skills. Because of the COVID-19 pandemic, visitation occurred virtually through Zoom for an unspecified period of time. N.T. at 27. Mr. Grove testified that, through the Zoom calls, it was apparent Father and Mother still did not implement the parenting skills he attempted to teach them. Id. at 28. Specifically, Mr. Grove testified Father and Mother "focus more on the negative [with regard to the Children's behavior], than . . . what we have taught them[, which is] to try and focus on the positive and move on from there." Id.

Based on the foregoing and the totality of the testimonial and documentary evidence, we conclude the Agency undertook reasonable efforts to reunify the Children with Father. Thus, Father's claim in this regard fails.

At this juncture, we note the testimonial evidence reveals the Children, ages 10, eight, and six at the time of the underlying hearing, have multiple behavioral and educational needs. Dr. John Jubas, the court-appointed educational decision-maker for the Children, testified, "All three of the [C]hildren require an abundance of services within the school system. Individual IEPs, [or] individual education program[s, are] in place for all three children, as well as a behavior program." N.T. at 47. J.G., Jr. attends a local school district school; the youngest child, M.G. attends a Head Start program; and J.G. attends a special school-district "school identified as the Alpha Program." Id. at 47. Dr. Jubas testified on direct examination:

[Agency's counsel:] With the services that are specifically in regard to the [C]hildren's education[,] have the [C]hildren progressed since you began working with them[?]

[Dr. Jubas:] When the [C]hildren first came to the schools they were not stable. When the [C]hildren now have been in a controlled setting we have identified some learning patterns. We have seen an abundance of gaps in their education because of gaps that occurred prior to attending any kind of formal education. . . . I use the word stable meaning that we're at a point in our education where we feel that we know where we need to start [with the Children] and use the implement[ation] of tools to get them there. But as far as any kind of progress, we have not advanced in education as we wanted to for the grade levels.

Id. at 48. Finally, Dr. Jubas testified, in response to inquiry by the trial court regarding the impact on the Children in the educational setting, if any, of visitation with Father and Mother, that the Children's teachers

find it is very hard to regroup and redirect the [C]hildren after a visit. They also see some emotions where the visit is scheduled and the [C]hildren know they are going somewhere that night. It is a disruption. I don't see [visitation] to be positive in any way other than just to take some valuable time when the teachers have to regroup the [C]hildren the next day.

Id. at 50.

Regarding the Children's behavioral problems, Caseworker Crouse testified that M.G., then age six, "has declining behaviors[:]"

[M.G.] is not yet potty-trained. He uses curse words[,] which he does not learn from the foster family. He swears at everybody. He is physically aggressive, which is quite concerning. And most specifically, he is physically aggressive towards [J.G.], and [J.G.] does not do a whole lot to defend himself. The only reason that [J.G.] probably doesn't sustain any injuries is because [M.G.] is too little to inflict any.

N.T. at 52.

Caseworker Crouse testified that J.G.'s "behaviors have gone downhill as well. He has developed a lot of toileting issues, [including] urinating in the home [in] places other than the toilet, defecating, and then that winds up all over the bathroom. . . . He is extremely needy. He asks everybody, including the foster parents, constantly if they love him, if they are going to try to help him." N.T. at 54.

With respect to J.G., Jr., then age 10, Caseworker Crouse testified that "[h]is behaviors have [also] declined." N.T. at 54. She testified that J.G., Jr., urinates on the floor and in his bed. He only recently learned how to tie his shoes . . . . He is not able to formulate his own thoughts. . . . He sleepwalks. He steals everything. It has come down to the point where he needs constant supervision within the confines of the foster home." Id. at 54–55.

Finally, we consider Father's testimony at the June 16, 2020, hearing. He stated his belief that "[a] lot of the testimony [was] wrong." N.T. at 71. Father stated he has learned from the services provided by the Agency, for example, to play games on the floor with the children, and that he and the Children have a connection during visitation. N.T. at 70-71. Father affirmed his love for the Children and desire to be reunited with them. Id. at 72-74.

With respect to its decision to change the Children's goals from reunification to adoption, the trial court found:

> [Father and Mother] do not appear to appreciate the realities of their situation. In fact, their perception is that they have done everything that [the] Agency has asked them to do to correct the situation. To exacerbate the situation, [M]other[10] and Father[11]

have criminal charges pending. After being involved with the family for approximately five years, [Agency Caseworker Carol] Crouse does not believe that [the] Agency has access to any other services that would assist the family further. . . .

_____

[10] Mother has disorderly conduct charges, stemming from J.G.'s physical abuse. . . . [N.T.] at 57.

[11] Father has endangering welfare of children charges pending. Id. at 58.

_____

While the [t]rial [c]ourt did not doubt . . . Father's . . . love for his children, based on the testimony, the [t]rial [c]ourt believes the parents lack the capacity to be able to provide the Minor Children with their most basic needs and believes that adopting the Agency's recommendation of adoption is [i]n the best interest of the Minor Children. Further, based on the testimony of Shaffer, Grove, Dr. Jubas, and Crouse, the [t]rial [c]ourt believed that at this moment visitations are detrimental to the [C]hildren's well-being. . . .

Here, Minor Children have been in the care and custody of the Agency for a significant period of time ([since] April 2018 for M.G. and October 2018 for J.G., Jr., and J.G.). The Agency has an extensive history of services with the family, but parents have made minimal progress to alleviate conditions necessitating the original placement. This [t]rial [c]ourt simply cannot continue to put Minor Children's [lives] on hold hoping Father will summon his ability to handle the responsibilities of parenting. Furthermore, based on Kashurba's testimony, Father does not have the mental capacity to step-in [sic] the role of primary parent. This [t]rial [c]ourt also cannot keep Minor Children in a perpetual foster care limbo, especially in light of the evidence that it is unlikely that Father will be able to meet the Agency's requirements and achieve reunification. As [the] Agency established, future services will not accomplish any progression toward reunification. Here the Agency has fulfilled its mandate, and it is time for the Minor Children to achieve the permanent and stable family life they deserve.

Trial Ct. Op. at 19–20.

We defer to the trial court's assessment of the witnesses' testimony. See R.M.G., 997 A.2d at 345. Upon review, the testimonial evidence supports the trial court's factual findings. See id. Based on the foregoing discussion and the totality of the record evidence, we conclude the trial court did not abuse its discretion in changing the Children's permanency goals to adoption. Accordingly, we affirm the orders.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/12/2021