J-S19017-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: L.A., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: S.M.A., MOTHER | : | |
| | : | No. 180 MDA 2024 |

Appeal from the Order Entered January 4, 2024
In the Court of Common Pleas of York County Juvenile Division at No(s):
CP-67-DP-0000162-2022

| | | |
|---|---|---|
| IN THE INTEREST OF: L.A., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: S.A., MOTHER | : | |
| | : | No. 181 MDA 2024 |

Appeal from the Order Entered January 4, 2024
In the Court of Common Pleas of York County Juvenile Division at No(s):
CP-67-DP-0000163-2022

BEFORE:   DUBOW, J., BECK, J., and COLINS, J.[*]

MEMORANDUM BY BECK, J.:                    **FILED: JULY 22, 2024**

S.M.A. ("Mother"), appeals from the December 20, 2023 orders of the York County Court of Common Pleas ("trial court") that changed the permanency goal for her two dependent children, La.A., a daughter born in September 2015 and Li.A., a son born in April 2018 (collectively, "Children"),

---

[*] Retired Senior Judge assigned to the Superior Court.

from reunification to adoption. On appeal, Mother argues that the trial court abused its discretion in changing the permanency goal to adoption because she was making progress towards completing the permanency plan and there was not clear and convincing evidence that the goal change would serve Children's best interests. After careful review, we affirm.

York County Office of Children, Youth and Families ("CYF") first became involved with Mother and Children in 2019 when they received a general protective services ("GPS") referral for allegations of conduct by Mother and D.J.R.A. ("Father") that placed Children at risk, including substance abuse by both parents and domestic violence.

On July 15, 2022, CYF received a GPS referral noting that police had been called to the home several times on reports of domestic violence between Mother and Father. The referral also stated that Father had overdosed at the home. Mother confirmed to an emergency duty caseworker that Father had overdosed in their bedroom but stated that she administered Narcan and that the police were not involved in the incident. Father submitted to drug testing through Justice Works with positive results for methamphetamines, fentanyl, buprenorphine, benzodiazepines, and MDMA. Mother refused to drug test at that time.

On July 18, 2022, a caseworker returned to the home and spoke to the children present. Children's half-sibling confirmed that police had responded to reports of Mother and Father fighting at the home. The caseworker

- 2 -

observed Children had a pet rabbit and found rabbit feces in the home. That same the day, Mother completed drug testing and tested positive for fentanyl and methamphetamines.

CYF developed a voluntary safety plan placing Children in the care of their paternal grandmother and Mother and Father would only have supervised contact. Mother and Father then reportedly attended detox at White Deer Run and were released. On August 1, 2022, state troopers responded to parents' home where Mother had locked herself inside with Children. Troopers verified that Mother locked herself in the home in response to paternal grandmother allowing Father to drive with Children while he was under the influence. Mother eventually allowed paternal grandmother to take Children to her home.

As a result, on August 4, 2022, CYF filed an application for emergency protective custody of Children. The trial court awarded temporary legal and physical custody to CYF for emergency caregiver placement. CYF then filed a dependency petition. On August 11, 2022, the trial court adjudicated Children dependent and ordered Mother and Father to cooperate with following programs and services: drug and alcohol testing and evaluation, a mental health evaluation, a domestic violence evaluation, and medication management. Placement hearings occurred at regular intervals over the next seventeen months.

True North Wellness conducted Mother's mental health evaluation, which recommended continued treatment for substance abuse. Mother

completed individual outpatient substance abuse treatment in November 2022, and moved to general outpatient services. She completed an anger management course online and engaged in medication management through Wellspan.

As to her domestic violence goal, Mother missed three appointments for her initial evaluation. After referring her to a new agency, Mother completed the evaluation with Dr. Jonathan Gransee ("Dr. Gransee") on February 15, 2023. Dr. Gransee indicated Mother demonstrated the knowledge necessary to protect Children, but she did not behave in a manner consistent with protecting them in the past and did not exhibit the motivation to protect Children. Dr. Gransee also observed that Mother tended to blame others for Children being near or witnessing domestic violence rather than take responsibility for her ability to control their exposure. Additionally, he concluded that Mother did not prioritize the needs of her children above her own based on the length of time she stayed with Father despite the ongoing and severe violence in the relationship. Dr. Gransee recommended that Mother engage in Dialectical Behavioral Therapy ("DBT") and continue working in recovery-based therapy. Mother started DBT therapy in December 2023.

Mother worked with RASE Project to complete addiction recovery plans and completed her drug and alcohol evaluation with Rehab After Work. She participated in unannounced, bi-weekly drug testing with Justice Works, but her compliance was not consistent. Between August and December 2022,

Mother's drug tests were negative for illicit substances and unprescribed medication. During the testing period between December 2022 and March 2023, however, Mother was unavailable for approximately fifty percent of the tests. Of the successful attempts, all were negative for illicit substances and unprescribed medication. Between June and August 2023, Mother tested positive four times for methamphetamine.

The trial court held a status review hearing on September 14, 2023. At the hearing, Linda Tirado-Lopez ("Tirado-Lopez"), the drug tester working with Mother, testified that Mother had stopped using her prescribed Adderall and let the prescription expire. Mother sought Adderall from a friend who Tirado-Lopez thought may have mixed methamphetamine into the capsule or medication bottle, as Tirado-Lopez testified that she knew the friend Mother was referring to and knew the friend was a methamphetamine user. Additionally, one test from this period was positive for creatinine, suggesting Mother was diluting the presence of something in her system.

As a result, the trial court ordered Mother to complete drug testing by toenail sample for review at the permanency hearing scheduled for September 14, 2023, the results of which would be reviewed at the hearing scheduled for December 14, 2023. The trial court indicated it sought testing to look back for one year and gave Mother an opportunity to tell the court what unprescribed drugs, if any, would show on the test. Mother responded that only her prescribed medications would be detected, acknowledging that the

test may also detect the methamphetamines that resulted in previous positive tests.

Mother did not initiate the toenail testing until December 6, 2023. The specimen collector, George Bett ("Bett"), determined that Mother had clipped her toenails too short to allow him to collect a sample. Mother returned to the testing site on December 18 and provided a hair sample for a five-panel test.[1]

As of the December 20, 2023 permanency review hearing,[2] no test results were available. CYF testified that they had requested the five-panel test rather than the seventeen-panel test that was also available. The trial court expressed a preference for a seventeen-panel test that also detected kratom and gabapentin, and Bett confirmed that the hair sample Mother provided could be tested that extensively.

Additionally, at the hearing, CYF identified several ongoing concerns with Mother, including her unstable income, an unreported man temporarily living in her basement, her pattern of tardiness for visits and hearings, and evidence she remained in contact with Father despite extensive domestic violence. CYF further noted that Children had been in CYF custody for

---

[1] According to Bett, a five-panel test would detect cocaine, amphetamine, methamphetamine, opiates, and PCP use over a period of three or six months depending on the cost and amount of testable material, and that both nail and hair samples, including dyed hair, could be tested in the same manner.

[2] The original permanency hearing scheduled for December 14, 2023, was continued at the request of Mother to obtain counsel after the trial court granted original counsel's motion to withdraw.

seventeen months. Shaina Wright ("Wright"), a CYF caseworker, testified that the placement goal of reunification was no longer appropriate because of the length of time the Children had been in care and that neither parent was appropriate for reunification.

Specifically, Wright testified that in November 2022, the resource parents reported that Mother and Father often participated in video calls with Children together. In December 2022, Mother filed a protection from abuse ("PFA") petition against Father after he allegedly broke into her home and punched her during an argument. While the PFA was in place, Mother allowed Father, whose visits with Children were required to be supervised, to participate in an unsupervised visit with her and Children, resulting in her visits returning to supervised status. Justice Works reported to CYF that Father's van was parked at Mother's house on two occasions when they were attempting to drug test Mother. Finally, the grandmother of Children's sibling testified that she saw Father at Mother's house when she stopped by during the first week of September 2023.

Further, Mother's employment status fluctuated. After a brief period working for her family, she was unemployed for several months. Mother indicated that she planned to reinstate her nursing license, which would require she cease taking her prescribed amphetamine medication for three months. At the time of the hearing, Mother was employed fulltime with Red Lion Home Care.

Mother's visits were most recently supervised by Pressley Ridge. Jessica Myers ("Myers"), a supervisor at Pressley Ridge, testified that Mother was late to several visits, but always arrived within the fifteen-minute grace period so that no visits were cancelled because of her tardiness. The only other issue relating to Mother's visits related to an incident where Mother attempted to administer an adult Tylenol split in half to Li.A., and was prevented from doing so by Myers. She observed that, overall, Mother's visits were positive and she had a strong relationship with both Children.

Moreover, since CYF assumed custody of Children, they have moved through three kinship homes. Children were initially placed in the care of Mother's sister, C.H. At the January 12, 2023, permanency hearing, C.H. indicated she could not provide permanent placement for Children and noted that her relationship with Mother had deteriorated to an untenable degree because of Mother's hostile and insulting behavior, as reflected in their text message history submitted into the record. After Children were placed with their paternal aunt and uncle, on April 13, 2023, they moved to the home of their maternal aunt and her partner, B.A. and M.H. At the December 20, 2023 permanency hearing, M.H. testified that Children were doing "really well" in their home. Children began equine therapy on October 4, 2023, as a preventative measure at the request of the kinship parents. Beyond the assistance provided by CYF to arrange for equine therapy, M.H. testified that he and B.A. needed no further support in caring for Children.

At the conclusion of the hearing, the trial court ordered a goal change from reunification to adoption, with a concurrent goal of adoption by B.A. and M.H.[3]  Mother filed a timely appeal; Mother and the trial court complied with Pa.R.A.P. 1925.

Mother raises two issues for our review:

I.  Whether the lower court erred and abused its discretion in changing the court ordered goal despite the testimony that mother had completed the hair follicle test but had not received the results from the test at the time of the hearing and was making progress in alleviating the circumstances which necessitated the original placement[?]

II.  Whether the lower court erred and abused its discretion in finding that the goal be changed to adoption from reunification without clear and convincing evidence that a change of goal would serve the best interest of the minor children[?]

Mother's Brief at 4.

We review a trial court's order to change the placement goal for a dependent child according to the following standard:

The standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law.  Accordingly, we review for an abuse of discretion.

***In re R.J.T.***, 9 A.3d 1179, 1190 (Pa. 2010).

_____

[3] We note that the trial court subsequently terminated Mother's parental rights to Children on April 15, 2024.  Mother has filed appeals from the involuntary termination decrees at docket numbers 691 and 692 MDA 2024.

- 9 -

The Juvenile Act governs goal change proceedings. *See* 42 Pa.C.S. §§ 6301-6375.

> Pursuant to [42 Pa.C.S.] § 6351(f) of the Juvenile Act, when considering a petition for a goal change for a dependent child, the juvenile court is to consider, inter alia: (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty-two months. The best interests of the child, and not the interests of the parent, must guide the trial court.

*In re A.B.*, 19 A.3d 1084, 1088-89 (Pa. Super. 2011) (citations and quotation marks omitted).

As the focus of dependency proceedings is on the child, "[s]afety, permanency, and well-being of the child must take precedence over *all* other considerations, including the rights of the parents." *In re N.C.*, 909 A.2d 818, 823 (Pa. Super. 2006) (emphasis original). That the parent has made progress toward completing the permanency plan does not outweigh the child's needs compelling a goal change. *Id.* at 827.

We will address Mother's claims together. Mother contends that the trial court abused its discretion in changing the permanency goal from reunification to adoption. Mother's Brief at 27. Mother notes that she had demonstrated moderate progress toward completing the permanency plan. *Id.* at 27, 28. While Mother acknowledges that she tested positive for illicit drugs, she argues

- 10 -

that she had done everything asked by CYF, aside from the nail testing. *Id.* at 29. To that end, Mother states that she had a hair follicle test, but had not received the results at the December 20, 2023 permanency hearing. *Id.* Mother further contends that she has maintained stable housing and employment, received outpatient mental health therapy, followed through with recommendations from her domestic violence evaluation, and completed drug and alcohol treatment. *Id.* at 29-30. Mother also argues that she has demonstrated her ability to parent Children. *Id.*

She also notes that, while she did have a male friend staying at her house, she had expected his stay to be brief and reported his presence to the court appointed special advocate, although not within the mandated timeframe. *Id.* Mother claims that CYF did not express concerns for Children's safety in her care. *Id.* at 32. Although she concedes that Children have been in placement for over fifteen of the last twenty-two months, Mother asserts that the Juvenile Act does not require a goal change to adoption based on Children's time in care alone. *Id.*; *see also id.* at 31 (arguing that reunification is feasible within twenty-two months of Children's placement considering the rate at which she has completed CYF's requirements). Finally, Mother argues that the trial court abused its discretion in ordering the goal change without clear and convincing evidence that it was in Children's best interests. *Id.* at 34.

In deciding to change Children's goal to adoption, the trial court found that Mother regularly evaded drug testing and failed to test negative on all the tests she did complete. Trial Court Opinion, 3/7/2024, at 17-19, 21; **see also id.** at 19 (stating that "Mother did not have a clean history of passing drug tests and the evasive actions taken by Mother … continued unabated throughout the pendency of the case[,] even up to the December 20, 2023[] [p]ermanency [r]eview [h]earing"). Additionally, the trial court observed Mother and Father's "long history of domestic abuse/violence, as to which Mother and Father were repeatedly caught/seen together during the pendency of the case, and then lied about being together." **Id.** at 21. The trial court also found that Mother's failure to report an unidentified man living in her home to caseworkers, as required by CYF, was a significant concern. **Id.** at 20-21.

The record supports the trial court's findings of fact. Mother's inconsistent submission to drug testing, several positive screens for methamphetamine, and her failure to diligently complete more comprehensive testing constitute substantial noncompliance extended throughout the pendency of the case. **See** N.T., 12/20/2023, at 14, 38; N.T., 9/14/2023, at 13, 17. Mother failed to obtain the more extensive toenail testing that the trial court ordered for three months, and when she finally complied, she had cut her toenails to such a degree that no sample could be collected. N.T., 12/20/2023, at 14. Upon learning that her color-treated hair could be tested

for controlled substances, Mother waited another two-and-a-half weeks to have that testing conducted. *Id.* at 16, 23. Mother did eventually complete a comparable test to the court-ordered toenail test does not explain her delay, the consequence of which was having no results for the trial court by the December 2023 permanency hearing. *Id.* at 16. Further, and importantly, Mother failed to assure the trial court that she has and will continue to abstain from drug use. *See* N.T., 12/20/2023, at 100-03.

The record further reflects that Mother has continued in her relationship with Father throughout the life of the case. Father has been seen inside Mother's house by a family member; his van has been parked in her driveway; they participated in video calls together with Children; and Mother allowed Father to attend one of her unsupervised visits with Children despite having a PFA against Father at that time. N.T., 9/14/2023, at 56; CYF Report, 6/14/2023, at 2 (CYF Ex. 1); CYF Report 1/5/2023, at 2 (CYF Ex. 1). Wright testified that exposure to domestic violence remains a risk for Children if Mother and Father remain in contact. N.T., 12/20/2023, at 80-81; N.T., 1/12/2023, at 41. According to Dr. Gransee, Mother's sustained relationship with Father constitutes a denial of responsibility for the safety of Children. *See* N.T., 4/13/2023, at 15, 18-19, 26. As such, Mother failed to show that she prioritizes their safety over her attachment to Father. *See In re R.M.G.*, 997 A.2d 339, 355 (Pa. Super. 2010) (finding that a child's best interests would not be served through reunification if the mother cannot assure the trial

- 13 -

court that she will not engage in relationships with men who perpetrate domestic violence).

Furthermore, although Children share a bond with Mother, the record reflects that Children have done well in their kinship placement and are receiving the parental care that they need, as well as preventative services, including equine therapy. N.T. 12/20/2023, at 52. M.H. testified that Children were doing "really well" in their home. *Id.* The kinship parents are willing to be long-term resources and need no further support from CYF. *Id.*

While Mother has made progress towards completing the permanency plan, the trial court was not obliged to delay seeking permanency for Children. *See In re A.K.*, 936 A.2d 528, 534 (Pa. Super. 2007) (finding that the best interests of the child determine a goal change to adoption, even if the parent has made progress toward completion of the permanency plan). "[A] child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re J.D.H.*, 171 A.3d 903, 910 (Pa. Super. 2017) (citation omitted).

Mother has not established that she is committed to the health, safety and well-being of Children. She has continued in her toxic and violent relationship with Father, placing Children at risk. She has also failed to maintain her sobriety, testing positive and/or failing to appear for multiple

drug tests. Children's physical and emotional needs are being met in the kinship parents' home, and the record supports a finding that it is in their best interests to remain in that home. Although Mother requests that this Court reweigh the evidence in her favor to establish the trial court abused its discretion in the goal change, we decline her invitation to do so as the record evidence supports the trial court's findings. ***See Int. of H.J.***, 206 A.3d 22, 27 (Pa. Super. 2019) (noting that the trial court evaluates the credibility of the witnesses and resolves any conflicts, and this Court cannot reweigh the evidence). As the trial court's decision to change Children's permanency goal to adoption is supported by the record, we find no abuse.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 7/22/2024

- 15 -